**UNITED STATES of America,**
**Plaintiff,**

v.

**John Robert HAY et al., Defendants.**

**Crim. No. 72-CR-246.**

United States District Court,
D. Colorado.

April 30, 1974.

James L. Treece, U. S. Atty., By Richard J. Spelts, Asst. U. S. Atty., Denver, Colo., for plaintiff; James J. Graham and Craig C. Donsanto, Dept. of Justice, Washington, D. C., of counsel.

Almon & Barsotti by Edward B. Almon, Denver, Colo., for defendant Hay.

## MEMORANDUM OPINION

WINNER, District Judge.

John Robert Hay, Robert Melloni, Pierre Vallee and Theophile Siauve have been indicted for conspiracy to defraud the United States. Only defendant Robert Hay is a citizen of the United States, and he is the only defendant who has been arrested and arraigned. The case is set for trial on June 10, 1974, and it is now before the Court on cross-motions of the government and defendant dealing with the admissibility of deposition exhibits which are Swiss bank records and which were the subject of the deposition. The deposition was taken under the provisions of 18 U.S.C. § 3491–§ 3494, and, although the underlying statute was enacted in 1936, no reported case passes on its constitutionality or interprets it.[1] Thus, this is a case of first impression, and it is also a case which involves quite unusual facts and circumstances which have required numerous pretrial hearings, and which necessitate a long opinion in ruling on the motions. The pretrial ruling on the admissibility of the deposition and/or the exhibits has been requested by each of the parties because of the tremendous expense involved in bringing witnesses from all over the world if the case is to be tried, and also because of the government's candid admission that if the exhibits are not received in evidence, it is probable that the prosecution cannot de-

---

1. The constitutionality of the statute was raised in United States v. Rangel-Perez (1959), D.C.Cal., 179 F.Supp. 619, but the constitutional issue was not reached in the decision because that case was decided on the ground of collateral estoppel to challenge defendant's alienage.

fend against a motion for judgment of acquittal at the close of its case. The difficulty and novelty of the problems presented require a summary of the charges made against Hay, and a statement of the facts leading up to the taking of the deposition. Moreover, it should be mentioned that some of the problems tie directly to delicate diplomatic negotiations now in progress which it is hoped will result in a treaty between Switzerland and the United States setting forth a mutually acceptable and workable agreement between the two nations for ascertainment by the United States government of limited information concerning secret Swiss bank accounts. Other problems result from differences between the judicial systems of Switzerland and the United States, as, for example, the inapplicability of the hearsay rule in Switzerland, and the fact that the right of confrontation of witnesses under the Sixth Amendment has no parallel under Swiss law. The problems are compounded by Swiss laws which prohibit or severely restrict the conduct of foreign judicial proceedings on Swiss soil. In its last analysis, the case presents a situation in which two friendly nations are attempting to mesh their laws and governmental policies and purposes with those of the other, and, as will be seen presently, with the treaty negotiations in mind, the taking of the deposition in question caused the persons involved to walk a tightrope between the differing positions of the two nations.

With this preface, the indictment charging defendants with a conspiracy to defraud the United States was returned August 18, 1972. The government charges that in 1966–1967, Hay was employed by Hydrotechnic Corporation of New York City, and that Hydrotechnic personnel were the consulting engineers on a water system project in Saigon, South Viet Nam. It is alleged that in 1962, acting through the Agency for International Development (A.I.D.), the United States loaned the government of Viet Nam $19,500,000.00, to assist in financing the project. Construction was accomplished under five contracts, but the indictment has to do with only one of them, a contract for $9,400,000.00, for pre-stressed concrete pipe, awarded to a French corporation, Les Establissements Eiffel. The job was completed in 1966, and Les Establissements Eiffel made claim for a $5,500,000.00 cost overrun. A. I. D., which was contractually liable for overruns, refused to pay without an audit, and Touche, Ross, Bailey and Smart were employed by A. I. D. to perform the audit. The audit was completed in 1967, and a $2,300,000.00 overrun payment was authorized and made to Les Establissements Eiffel. The government contends that this sum was deposited to the French firm's account in the Chase Manhattan Bank on October 2, 1967, and that on the same day $538,000.00 of the deposit was transferred from the Les Establissements Eiffel account to the account of one of its employees, defendant Theophile Siauve. Then, says the government, two transfers were made from Siauve's account to two secret bank accounts in the Union Bank of Switzerland in Geneva. One transfer, in the amount of $125,000.00, was to account No. 580.425 P.L. and the other in the amount of $408,000.00, went into account No. 580.-424 PL.

It is the theory of the United States that Hay conspired with the other three defendants, all of whom were employees of Les Establissements Eiffel, to defraud the United States, and that the $125,000.00 transfer by Siauve to secret account No. 580.425 PL was a payment to Hay in furtherance of the conspiracy. The government asserts that Hay is the owner of secret account No. 580.425 PL, and, manifestly, proof of that fact is probably crucial to the government's case. Additionally, the government claims that the Swiss bank records will disprove certain statements made by Hay in the course of the investigation concerning the history and source of the secret account.

Not surprisingly, the investigation of this alleged conspiracy extended over a long period of time and into many foreign countries. More than 100 persons were interviewed, and the geographic area of the investigation included Vietnam, Thailand, Canada, France, Switzerland, Iran, Spain, Guam, Laos, Tunisia, and, of course, the United States. The first suggestion that Hay was involved in criminal activity in connection with the cost overrun settlement was received in January, 1969, and this triggered the long investigation. In March, 1972, the Federal Department of Justice and Police of Switzerland arranged to have the Union Bank of Switzerland furnish to the Department of Justice copies of records of secret account No. 580.425 PL, and those records purport to show that the account is in Hay's name. As will be discussed later, this information was acquired by a Swiss Magistrate's search warrant. At that point in time, the State Department was required to make inquiry as to whether a bank officer would be willing to come to the United States to testify, and it was learned that the bank would not consent to have a bank officer testify in this country. Negotiations were then commenced to see if agreement could be reached with the Swiss government and with the bank for the taking of a deposition under 18 U.S.C. § 3491. In the meantime, a search for Hay was initiated, and in June, 1972, it was learned that he was working in Mali on another A. I. D. project.

In July, 1972, at least a tentative agreement was reached with the Union Bank of Switzerland and the Swiss government to permit an unprecedented deposition in Switzerland under the provisions of 18 U.S.C. § 3491. With these preliminaries out of the way, an indictment was presented to and was returned by a grand jury.[2] The indictment was ordered sealed, and efforts

were made to persuade Hay to return to the United States from Mali under pretext of need for consultation with A. I. D. officials on the Mali project. Hay declined all invitations to return, and he could not be extradited because there is no extradition treaty between Mali and the United States. The State Department informally agreed with the government of Mali to have Hay declared *persona non grata*, and Mali cancelled his visa. The Mali police saw to his boarding of a plane for Dakar, Senegal, where he boarded another plane destined for New York City. By singular coincidence, United States Marshals were also aboard, and Hay was arrested as the plane started to land in New York. He appeared before a Magistrate in New York City, and was brought to Denver, where he again appeared before a Magistrate in advance of his June 1, 1973, arraignment.

Numerous motions have been filed and argued, and Hay has pressed his Sixth Amendment rights to a speedy trial. He has demanded that the indictment be dismissed because of claimed violation of those rights, and I have ruled that because of the unusual nature of the case, the indictment should not be dismissed because, as will be discussed presently, the government has done nothing to intentionally delay the case, or to take advantage of Hay, and it has done all that can be reasonably required of it to push the case to trial.

Nothing I might say would add to the abundant appellate case law on a defendant's Sixth Amendment right to a speedy trial. As to pre-indictment delay, I have studied United States v. Marion (1971), 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468; Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101; United States v. Beitscher (1972), 10 Cir., 467 F.2d 269; United States v. Merrick (1972), 10 Cir., 464 F.2d 1087, and many other cases. Applying the

2. Venue lies in Colorado because the last known residence of Hay, the only citizen of the United States charged, was in Colorado Springs, Colorado, and Hay was in Mali when the indictment was returned. See, 18 U.S.C. § 3238.

tests outlined in *Barker*, the pre-indictment delay was long, but the reasons for the delay are understandable and justifiable. The defendant has pressed his claim for dismissal because of pre-indictment delay, but his showing of prejudice from the delay is minimal, and no deprivation of either Fifth or Sixth Amendment rights has been established.

The post-indictment delay presents a separate question. Defendant has pressed for trial, and he has shown that his ability to earn a living has been impaired—especially in light of the fact that he is customarily employed in far distant countries, and his passport has been lifted. He has not shown that his ability to defend against the charges made is lessened because of the delay, and certainly there is no suggestion that the government has done anything other than to strive mightily to take the essential Swiss deposition at the earliest possible time—a chronology which will be related in a moment. Applying the balancing tests of Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, which were recognized in United States v. Merrick (1972), 10 Cir., 464 F.2d 1087, I have heretofore denied defendant's motions to dismiss because of alleged delay. As was said in *Barker*, the "peculiar circumstances of the case" are relevant and important, and "delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge," and the conspiracy charge here is serious and most complex. The post-indictment delay here is a bit shorter than the post-arrest delay upheld in United States v. Singleton (1972), 2 Cir., 460 F.2d 1148, and the justification for the delay here is to me much greater than the justification in *Singleton*. It is for these reasons that I have held and I again hold that delay has deprived defendant of no constitutional right under the facts and circumstances of this case. Hay's renewed motions to dismiss because of trial delay are denied.

Hay's first assorted motions directed to the indictment were filed, briefed, orally argued and ruled on promptly, and the question of the Swiss deposition was first raised by motion for the issuance of a commission pursuant to 18 U.S.C. § 3491 et seq. filed June 29, 1973. The request of the government for the issuance of a commission was opposed by defendant in a brief filed August 3, 1973, and the government replied August 22, 1973. Oral argument was had August 23, 1973, with rulings being made on all then pending motions, including a ruling that the requested commission should issue. A formal order was prepared and signed September 14, 1973, and the delay in the preparation of the written order stemmed from the Court's concern over defendant's right to confront witnesses testifying against him. To meet this difficult problem, it took time to obtain Justice Department agreement that the government would pay the way of defendant and defense counsel to Switzerland. Additionally, special arrangements had to be made with the State Department for the issuance of a temporary restricted passport to defendant. Defendant was given the choice of going to Switzerland at the government's expense or waiving his right to attend the deposition, and on September 19, 1973, he elected to attend the deposition. His written election said in material part "that he and his American counsel intend to be present at the execution of this Commission, and by oral interrogatories, cross-examine the witness."

The machinery to take the deposition was then put in motion, but it was not until November 29, 1973, that the Court was advised by S. Richard Rand, American Consul in Bern, Switzerland, that he had received the commission, and that:

"Although a U. S. consular officer is generally prohibited by Swiss regulations from personally taking depositions in Switzerland, we are actively pursuing with the appropriate Swiss officials the possibility of being granted a special permission in the matter of U. S. A. v. John Robert Hay, et al. I regret the unavoidable

delay in acceding to the Court's request in this regard. I will inform you further immediately upon a decision from the Swiss authorities."

The day following receipt of this letter, another hearing was held. At it, I advised the government that the matter would not be permitted to simply hang-fire indefinitely and that a deadline would have to be fixed within which the deposition would have to be taken or the government would be required to go to trial without it. A February, 1974, deadline for the deposition was suggested. On December 10, 1973, a letter was received from the Department of Justice, and that letter said in material part:

"As you know, this commission was issued pursuant to the provisions of 18 U.S.C. 3491, et seq. at the request of the Government for the limited purpose of taking the deposition of an officer of the aforesaid Swiss bank to authenticate records which it had previously furnished this Department through the auspices of the Swiss Courts in response to a request for international judicial assistance for use in the prosecution of the above captioned case.

"According to the telegraphic response from our Embassy in Switzerland, neither the Federal Department of Justice and Police, nor the Union Bank of Switzerland, have any objections to the execution of the commission according to its terms, including the right of the defendant, John Hay, to be present at the time with counsel of his choosing and to interpose oral cross-examination limited in scope to the issues of the authenticity of the subject bank records, the manner of their preparation, and the qualifications of the bank officer deposed to testify concerning these facts."

The letter then explained that Thomas Egger, a fonde de pouvoir of the bank, would be the witness, and the week of February 11, 1974, was suggested as an appropriate time for the deposition to be taken at the bank's offices in Geneva.

Prohibitions under Swiss law against having a United States Marshal accompany Hay to Switzerland were discussed in the letter, and the mechanics of obtaining the limited and restricted passport for Hay were outlined. The letter explained that the State Department had worked out an agreement with Swiss officials which would prevent Hay from crossing any Swiss frontier under the restricted passport, except, of course, for a return crossing on a nonstop flight destined for the United States. An appropriate order followed on January 4, 1974, which amended the conditions of Hay's bond to allow his trip to Switzerland under the restricted passport, and all of the details of the restricted passport were worked out with the State Department.

Two weeks later, Hay changed his mind and decided he didn't want to go to Switzerland. In open court, he orally waived his right to attend, and he signed a written waiver of his right to be present at the deposition in which he said:

"[He expressly waived] the opportunity to be personally present and confront the witness at said deposition as well as personally and orally cross-examine said witness on the record; provided, however, he understands that his American counsel will personally attend said deposition and represent him pursuant to the terms of the Commission."

By letter of January 18, 1974, and by telegram of January 25, 1974, the deposition was set for January 29, 1974, at the bank's offices in Geneva, all of which sets the stage for the somewhat remarkable events which occurred in Geneva, commencing on January 29th. On that agreed date, at the offices of the Union Bank of Switzerland, in addition to the shorthand reporter, these persons met:

Edward Almon, attorney for the defendant Hay.

Richard J. Spelts, Assistant U. S. Attorney.

Thomas F. Egger, Vice-president, Union Bank of Switzerland, the witness.

Francois Rais, the bank's lawyer.

S. Richard Rand, U. S. Consul, Bern, Switzerland, to whom the commission was issued.

Things didn't go too smoothly that day. Mr. Egger was worried that he might violate Swiss law if he testified, and he thought that any claimed need for the deposition was an absurdity. Putting oneself in his shoes, Mr. Egger's views are completely understandable and logical. The deposition was scheduled to authenticate bank documents, but they had already been authenticated under Swiss law. That authentication took place on March 8, 1972, when Magistrate Foex executed a search warrant concerning secret account No. 580.425 PL. [It will be remembered that this authentication had been arranged through agreement of the Department of Justice with the Federal Department of Justice and Police, and it was through this examination that the government first obtained copies of the Swiss bank documents.] The Swiss Magistrate's authentication was ex parte, but it satisfied all of the requirements of Swiss law, and Mr. Egger thought that the law of the United States was a little silly if it refused to receive hearsay evidence and if it demanded any right of confrontation and cross-examination. That is why, early in the session of January 29th, Mr. Egger explained:

"Such a question is absolutely obvious and that does not have to be proved. On the copy it is stated Geneva, December 2, 1974. Then it was made out on the second of December, 1974, and in Geneva. That is on the document. It is an obvious piece. Such authentification, such a question could be asked to any American bank in the U. S. First National, they will tell you we get documents from the Union Bank all the time. It is Geneva, December 2. As far as our rule, we say

those documents are the documents we remitted to the court here in Geneva. That is always the way it was handled. It always was sufficient up to now.

. . . . . . .

"That is where the legislation, the American legislation and Swiss legislation are different. If I admit a document and I admit to its authenticity to the originals we have, then the court here believes me. So we say, listen, if our Swiss court believes me, there is no reason the American court should not believe it. Some way or another they always found ways in other rogatories we had to have them approved by those terms. All that we say is those are documents authentic to the bank record we have. It was me who made the photocopies, and I remitted the copies to the court here in Switzerland, and the court transmits them over to the United States."

Things went from bad to worse that first day, but government counsel fared worse than did defense counsel because, although the witness would answer no questions posed by the Assistant United States Attorney, Mr. Egger said:

"As far as the relationship between Mr. Hay's attorney and us, it is a different relationship than the relationship between Government officials and us. . . .

. . . . . .

"There is one thing to put straight. I say I agree to answer questions to Mr. Almon. I don't agree to answer questions as a witness in front of everybody. I don't agree at all to going into cross examination. That was refused from the very beginning. So any questions Mr. Almon could have would be questions he asked us in another meeting we have due to his right as representative of our client. But no questioning me as a witness because we do not witness as such."

It occurs to me that defense counsel never had it so good. The government's witness was willing to disgorge every-

thing he knew to defense counsel, but he wouldn't talk to government counsel. From aught that appears in the record, this invitation to visit defense counsel's Valhalla was not accepted, and with reiteration by Mr. Egger that he wouldn't be cross-examined, over defense counsel's objection, the deposition was recessed to permit consultation between the Department of State and the Swiss Department of Justice and Police.

At 4:30 p. m. that same afternoon, Mr. Almon, Mr. Spelts and Consul Rand met in the lobby of the bank where Mr. Spelts remained. The other two went to Mr. Egger's offices, but there had been a misunderstanding, and Mr. Egger was not available. The group disbanded at 5:00 p. m. to reconvene at 10:00 a. m. the following day.

It did, and on the morning of January 30, Mr. Almon, Mr. Egger, Mr. Rais, Consul Rand and Jean-Louis Bryand, Inspector Principal de la Police de Surete, Geneva, met in a bank conference room. Mr. Spelts was requested to remain in the bank lobby, and he did. By addendum to the deposition record made in the bank lobby after the deposition was concluded it is learned from a statement made by Mr. Spelts:

"I would merely like the record to reflect that on Tuesday, January 29, 1974, I was present as the proceedings began in the bank offices. That Tuesday afternoon I was advised by Mr. Rand to again be at the bank at approximately 4:30 p. m. I was further advised by Mr. Rand that, after diplomatic contact, he had learned the bank would not go ahead with the proceedings at all if (1) the Assistant United States Attorney were present and ask(ed) questions either directly of the witness or through Mr. Rand, (2) that if the Assistant United States Attorney were even present, and (3) if questions the bank did not intend to answer were even asked of the bank on the record.

"I was further advised that for each group of documents mentioned in the written interrogatories of the United States the bank would answer generally only three questions of the United States, that is (1) describe what the document is, (2) have you compared the document to an original in the bank, and (3) is the document a true and exact copy of the bank original.

"Then, on Tuesday, January 29, 1974, I consulted with John Keeney, Deputy Assistant Attorney General of the United States Department of Justice, Washington, D. C., and thereafter, on behalf of the United States, I requested that Mr. Rand consider the possibility of doing the following: (1) propound on behalf of the United States the three questions regarding each category of documents, (2) regarding Exhibit U.B.S. 41 that Mr. Rand ask on behalf of the United States the four questions contained in our written interrogatories, and (3) in view of the limitations placed upon the United States attorney, would you, Mr. Rand, consider asking Mr. Egger to confirm whether he was the same Mr. Egger who appeared before Mr. Foëx, Swiss Examining Magistrate, on March 8, 1972, turning over the documents to the Swiss Magistrate and, if so, was the record made by the Swiss Magistrate of Mr. Egger's testimony true and correct.

"I would also like the record to reflect that at 4:30 p. m., Tuesday, January 29, 1974, we met at the bank with Mr. Rand, the reporter, and the defense attorney, and that since the bank lobby was closing, I waited on the sidewalk outside [in the rain] while the other three went inside the bank pursuant to the arranged appointment. Thereafter, at approximaterly 5:00 p. m., I again met with the above three people as they exited the bank and was advised the meeting had been rescheduled for Wednesday morning, January 30, 1974, at 10:00 a. m. Further, that on Wednesday, January 30, 1974, I again met at 9:45 a. m. with Mr. Rand, the reporter, and the defense attorney in the bank lobby

where I waited while the above three went to offices elsewhere in the bank to meet with bank officials."

■ Mr. Spelts' explanatory statement made in the bank lobby after the deposition had been concluded is set forth in full because of an argument by Hay that the deposition should be excluded on the ground that Mr. Rand did not ask all of the government's written questions attached to the commission. Indeed he did not, but had he insisted on doing so, there would have been no deposition. If anyone was hurt by the omission, it was the government, and rather than criticize, I commend Mr. Rand for the excellent job he did in rolling with the unexpected punch and in accomplishing the clear intent of the Court's commission. It is true that to minor extent he paraphrased some of the written interrogatories, but at no time did he go beyond the scope or the intent of the government's written questions the commission directed him to ask. Certainly, defense counsel has no claim of surprise because of any of the questions asked.

At the outset of the deposition on January 30, 1974, Mr. Egger identified the Proces Verbal de Perquisition certified by Magistrate Foëx. [A copy of it and a translation of it had been supplied to Mr. Almon in advance, and a copy was marked and received as Commissioner's Exhibit A.] Mr. Egger was asked "whether you confirm that the information contained therein is true and correct." He replied that the information is correct, and, in summary form, that information is that the records of the Swiss Union Bank show as to secret account No. 580.425 PL:

(a) The account was opened September 20, 1967, by John Robert Hay, and a proxy was granted by Hay to his wife. Another proxy was extended by him on March 18, 1968, to Mrs. Therese Prud'homme Hay.

(b) Copies of bank records [Deposition Exhibits 3 through 40] were delivered to the examining magis-

trate, together with correspondence between the Bank and Hay. [The document numbers of the documents delivered to Magistrate Foex correspond with the deposition exhibit numbers.]

(c) A letter dated April 2, 1970, is a forgery, and the testimony tending to establish that the letter is a forgery is summarized. [This is deposition Exhibit 41.]

There is nothing wrong with the procedure adopted by Consul Rand in connection with Commissioner's Exhibit A, and Mr. Egger said under oath that the information contained in the Magistrate's summary was correct. See, 58 Am.Jur., Witnesses, §§ 595–596, and A.L.R. Annotations cited; McIntyre v. Reynolds Metals Corp., (1972), 5 Cir., 468 F.2d 1092; United States v. Boreli (1964), 2 Cir., 336 F.2d 376; Finnegan v. United States (1954), 8 Cir., 204 F.2d 105, and Zimburg v. United States (1944), 1 Cir., 142 F.2d 132. He was available for questioning by Mr. Almon on this summary of his former testimony, but no questions were asked or attempted to be asked of him as to this exhibit.

With the exception of exhibits 41 and 42–B, the following typical questions were put by Mr. Rand to Mr. Egger:

1. Are the exhibits true and exact copies of the original records of the Union Bank of Switzerland? [He responded that they were.]

2. He was then asked to describe the documents, and he did so.

At the windup of Mr. Rand's questioning, he asked:

"Mr. Egger, were the documents you have identified as records of the bank made in the regular course of business of the bank at or about the time of the transaction?" An affirmative response was received.

Mr. Egger said that Exhibit 41 is not a part of the bank's records and the government says that it is a forgery which is what Commissioner's Exhibit A shows

Mr. Egger told the Swiss Magistrate. Exhibit 42–B purports to be a letter from Hay to the bank, and I shall discuss its admissibility under 28 U.S.C. § 1732 separately.

 When it came Mr. Almon's turn to orally question Mr. Egger, at first he directed his questions to Mr. Egger through Mr. Rand. This lasted for about a page of the transcript, but from then on Mr. Egger responded directly to Mr. Almon's questions. He did refuse to answer some questions, and illustrative of his position is this comment by Mr. Egger:

"I won't answer. The Commission was fixed quite clearly to four points, I would say, and this question goes further than what was agreed with the Federal Police."

I agree with the witness. The deposition was for the limited purpose of determining admissibility under 28 U.S.C. § 1732, and the refused questions had nothing to do with the authenticity of the documents.[3] Mr. Egger readily conceded that he had no personal knowledge of the factual information reflected on the documents, and he insisted on confining his testimony to the area of authenticity. Mr. Egger refused to answer some questions, but the questions did not deal with authenticity, and most of the refused questions were subject to the objection that the documents speak for themselves.

In holding as I do that there was no impermissible curtailment of defendant's right of cross-examination, I am not unaware of The Ottawa, 3 Wall. 268, 70 U. S. 268, 18 L.Ed. 165, and its progeny including Alford v. United States (1931), 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624. I know that the right of cross-examination is encompassed within the Sixth Amendment right of confrontation. Pointer v. Texas (1965), 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923. I have

studied United States v. Jorgenson (1971), 10 Cir., 451 F.2d 516, where Judge Hill said:

"The right of confrontation extends to *areas* of cross-examination. An area which is properly subject to cross-examination cannot be denied the accused. A limitation which prevents cross-examination into an area which is properly subject to cross-examination does constitute reversible error. See, Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); Alford v. United States, 282 U.S. 657 (1931). The characteristic feature in this situation is the complete denial of access to an area which is properly the subject of cross-examination; the *extent* of cross-examination is discretionary with the trial judge. Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). This distinction has long been recognized by this Court.

\* \* \* \* \* \*

"[The] exercise of discretion will not be upset unless it was clearly prejudicial. Whitlock v. United States, 429 F.2d 942 (10th Cir. 1970).

"It is therefore incumbent on the appellant to show the limitation on cross-examination restricted either (1) his right of cross-examination by showing a denial of cross-examination on an area properly subject to cross-examination, or (2) a prejudicial limitation on the extent of cross-examination."

██ ██ In holding that the permitted cross-examination was adequate, I hold only that it was adequate to authenticate records under the provisions of 28 U.S. C. § 1732 as that section is incorporated in 18 U.S.C. §§ 3492, 3493. I emphatically do not hold that the cross-examination would satisfy the cross-examination permitted in a deposition taken under 18

---

3. It is to be recalled that government counsel was not allowed to be present, and the witness had to make his own objections. I shall discuss the extent of permissible cross-examination later.

U.S.C. § 3503.[4] This statement needs to be explained, and the explanation requires a comparison of the statutes and the purposes of depositions taken under the two different sections. A deposition taken under 18 U.S.C. §§ 3492, 3493 is one taken for the limited purpose of authenticating records, while a deposition taken under 18 U.S.C. § 3503 is to develop substantive facts concerning the charge—facts which the witness must know of his own knowledge. Personal knowledge of the witness as to entries contained in business books and records is not required to qualify exhibits for admission into evidence under the language of 28 U.S.C. § 1732, and that authentication of records is all which is permitted in 18 U.S.C. §§ 3492, 3493. 28 U.S.C. § 1732 says:

> "In any court of the United States and in any court established by Act of Congress, any *writing or record*, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, . . . if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.
>
> "All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.
>
> "The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

This federal shopbook rule is an outgrowth of the common law which gradually grew to permit hearsay evidence to prove entries in books of account. The statute is a copy of the Model Act for Proof of Business Transactions formulated in 1927, and either it or the Uniform Business Records as Evidence Act agreed upon in 1936 has been adopted by almost every state. An excellent history of shopbook statutes is found in the Advisory Committee note to Rule 803(6) of the proposed Federal Rules of Evidence, and, in fact, as those rules have been approved by the House [H.R. 5463] 28 U.S.C. § 1732(a) is repealed and the new rule will replace the statute. Rule 803(6) permits authentication by any witness who has custody, and the required qualifications of the witness to authenticate records are extremely limited. The sole purpose of Mr. Egger's testimony was to authenticate the records. He did so on direct examination. the only questions he refused to answer on cross-examination were not questions which would have rendered the exhibits inadmissible no matter what the answers.[5] It has been said, "Under the American rule, a witness called merely to identify letters, statements, or other instruments may not be cross-examined regarding other matters in issue in the case." 58 Am.Jur. Witnesses, § 637. I do not think that the limitation on cross-examination imposed by Mr. Egger brings the testimony within the tests enunciated in United States v. Jorgenson, *supra*. Mr. Egger's testimony authenticated the deposition bank record exhibits in accordance with the requirements of 28 U.S.C. § 1732, and all deposition exhibits except Exhibit 41 and 42–B have been properly authenticated. See, United States v. Re (1964), 2 Cir., 336 F.2d 306.

█ The deposition affirmatively established that Exhibit 41 is not a bank record; and, that being true, it cannot be received under the statute. Exhibit

---

4. Davis v. Alaska (1974), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347, would come into full play under § 3503, but I do not think that case demands that these bank records be excluded when the deposition was under §§ 3492, 3493.

5. A custodian could authenticate computer printouts unintelligible to the witness, and, accordingly, questions to Mr. Egger as to the meaning of record entries could not render the records inadmissible.

42–B is a letter purporting to have been received by the bank from defendant Hay. It cannot be said to be a record made by the bank in the ordinary course of business. I acknowledge that there are cases which permit the introduction of received correspondence under 28 U.S.C. § 1732, but there are cases which hold to the contrary. Edwards v. United States (1967), 10 Cir., 374 F.2d 24; Bisno v. United States (1961), 9 Cir., 299 F.2d 711; United States v. Kelly (1965), 2 Cir., 349 F.2d 720; Phillips v. United States (1966), 9 Cir., 356 F.2d 297; United States v. Sherfey (1967), 6 Cir., 384 F.2d 786; Hussein v. Isthmian Lines, Inc. (1968), 5 Cir., 405 F.2d 946, and Otney v. United States (1965), 10 Cir., 340 F.2d 696. 28 U.S.C. § 1732 does not make admissible everything stowed in a business file, and I do not think that it can be received under § 1732.

■ The determinations made thus far meet only some of Hay's arguments, and it is necessary to consider his remaining contentions. He says that the statute, i.e., 18 U.S.C. §§ 3492, 3493, is unconstitutional under the Fifth and Sixth Amendments. I know not what more could have been done to insure Hay's right to confront the witnesses against him, and he surely waived that right. But, says defendant, the jury has a right to see and evaluate Mr. Egger in passing on his credibility. I think that there is no Sixth Amendment right to have a jury confront witnesses, but Hay argues that the right is a Fifth Amendment right as a part of due process of law. This is not the law, because testimony taken outside the presence of the jury has been admitted when the defendant has had confrontation. Mattox v. United States (1895), 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409; Mancusi v. Stubbs (1972), 408 U.S. 204, 92 S.Ct.

2308, 33 L.Ed.2d 293; United States v. Brown (1969), 10 Cir., 411 F.2d 1134, and Goldsmith v. Cheney (1971), 10 Cir., 447 F.2d 624.

I find nothing unconstitutional in 18 U.S.C. §§ 3492, 3493, and, surely, if §§ 3492, 3493 is subject to constitutional attack, 18 U.S.C. § 3503 would be unconstitutional. That section permits depositions in criminal cases ranging in scope far beyond mere authentication of records.[6] Yet, the constitutionality of the 1970 statute, 18 U.S.C. § 3503, is upheld in United States v. Singleton (1972), 2 Cir., 460 F.2d 1148.[7] The tests of California v. Green (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, have been established here. Mr. Egger is not subject to service of subpoena, and the government has made a good faith effort to persuade him to come to the United States to testify. He has refused to come, and his unavailability at time of trial is not the government's fault—indeed, the government would like to have him here. As was said in *Singleton*:

"Therefore, as the witness was actually unavailable and the reason for his absence was not attributable to wilful or negligent Government action or omission, the use of his deposition at trial was constitutionally permissible."

The use of this Swiss deposition, or, at least, the exhibits authenticated by it, are constitutionally permissible.

It will be easier to discuss defendant's remaining arguments if 18 U.S.C. §§ 3492, 3493 are quoted at length at this point. 18 U.S.C. § 3492 provides:

"(a) The testimony of any witness in a foreign country may be taken either on oral or written interrogatories, or on interrogatories partly oral and partly written, pursuant to a commission issued, as hereinafter provided, for the purpose of determining wheth-

6. The limited purpose of §§ 3492, 3493 depositions is spelled out in the legislative history of the statute.

7. In a vigorous dissent, Judge Oakes adopts many of the arguments advanced by defend-

ant here, but I agree with the majority, and I too think that California v. Green (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 settles the constitutional argument.

er any foreign documents sought to be used in any criminal action or proceeding in any court of the United States are genuine, and whether the requirements of section 1732 of Title 28 are satisfied with respect to any such document (or the original thereof in case such document is a copy). Application for the issuance of a commission for such purpose may be made to the court in which such action or proceeding is pending by the United States or any other party thereto, after five days' notice in writing by the applicant party, or his attorney, to the opposite party, or his attorney of record, which notice shall state the names and addresses of witnesses whose testimony is to be taken and the time when it is desired to take such testimony. In granting such application the court shall issue a commission for the purpose of taking the testimony sought by the applicant addressed to any consular officer of the United States conveniently located for the purpose. In cases of testimony taken on oral or partly oral interrogatories, the court shall make provisions in the commission for the selection as hereinafter provided of foreign counsel to represent each party (except the United States) to the criminal action or proceeding in which the foreign documents in question are to be used, unless such party has, prior to the issuance of the commission, notified the court that he does not desire the selection of foreign counsel to represent him at the time of taking of such testimony. In cases of testimony taken on written interrogatories, such provision shall be made only upon the request of any such party prior to the issuance of such commission. Selection of foreign counsel shall be made by the party whom such foreign counsel is to represent within ten days prior to the taking of testimony or by the court from which the commission issued, upon the request of such party made within such time."

18 U.S.C. § 3493 sets forth procedures to be followed:

"The consular officer to whom any commission authorized under section 3492 of this title is addressed shall take testimony in accordance with its terms. Every person whose testimony is taken shall be cautioned and sworn to testify the whole truth and carefully examined. His testimony shall be reduced to writing or typewriting by the consular officer taking the testimony, or by some person under his personal supervision, or by the witness himself, in the presence of the consular officer and by no other person, and shall, after it has been reduced to writing or typewriting, be subscribed by the witness. Every foreign document, with respect to which testimony is taken, shall be annexed to such testimony and subscribed by each witness who appears for the purpose of establishing the genuineness of such document. When counsel for all the parties attend the examination of any witness whose testimony is to be taken on written interrogatories, they may consent that oral interrogatories in addition to those accompanying the commission may be put to the witness. The consular officer taking any testimony shall require an interpreter to be present when his services are needed or are requested by any party or his attorney."

Most of defendant's remaining arguments are a nit-picking of the statutes, and they ground on the proposition that criminal statutes are to be strictly construed—within reasonable limits, a truism.

■ Defendant says that the testimony wasn't taken in accordance with the terms of the commission as is required by § 3493. This argument reiterates the complaint that not all of the government's written questions were asked, and I have already disposed of the contention with the comments, (a) if anyone was hurt, it was the government, (b) the spirit of the commission was

fully complied with, and (c) Consul Rand had no choice, and he must be found to have possessed some reasonable discretion to meet unforeseen circumstances as they developed.

■ § 3493 says, "Every person whose testimony is taken shall be cautioned and sworn to testify to the whole truth and carefully examined." Defendant argues that no such caution was given. This oath was taken by the witness:

"You do solemnly swear that you will tell the truth, the whole truth, and nothing but the truth, in answer to the several interrogatories and cross-interrogatories now to be put to you. So help you God.

"Mr. Egger: I do."

The taking of that oath constituted a caution to testify to the whole truth, and the witness swore that he would do so. I can't find any failure to obey this command of the statute.

■ The statute then says that the testimony shall be reduced to writing, and, "after it has been reduced to writing or typewriting, be subscribed by the witness." Mr. Egger didn't sign the testimony. By certifying affidavit attached to the deposition, Consul Rand tells why:

"I hereby affirm, that in pursuance of that commission, on January 30, 1974, I personally presided over the proceeding whereby Mr. Thomas F. Egger, an officer of the Union Bank of Switzerland, gave oral testimony concerning the authenticity of documents attached as Exhibits to the Commission. A written transcript of Mr. Egger's testimony was prepared by a stenographer under my direct supervision.

"I further affirm that in accordance with instructions of my Commission, I submitted the written transcript to Mr. Thomas Egger for signature through the intermediary of the Swiss Federal Department of Justice and Police as had been previously agreed. The witness' employer, the Union Bank of Switzerland, has refused to permit Mr. Egger to sign the written record of his testimony stating that, although Mr. Egger had been permitted to certify orally that certain of the bank documents were exact and authentic, it feared that subscribing the testimony would be considered in derogation of Swiss law. Although the Union Bank of Switzerland was reportedly assured by the Swiss Federal Department of Justice and Police that the act of signing the record would not be a violation of Swiss law, the Bank has persistently refused permission.

"I further affirm that there has never been any question in the Bank's action that the written record submitted was not an exact and correct record of Mr. Egger's testimony. Based upon my personal observation, by my direct supervision of the stenographer in preparing the transcript and a careful review of the final transcript, I hereby affirm that the foregoing transcript is a true and exact record of the testimony of Mr. Thomas Egger, taken in pursuance of my Commission."

This certifying affidavit not only explains the reasons, but, additionally, there was compliance with 18 U.S.C. § 3494. Moreover, it is to be remembered that although Mr. Egger thought that Swiss law prohibited his signature on the document, he did sign each of the exhibits as a certification of their authenticity. Additionally, the certifying affidavit of Consul Rand was drafted in strict accordance with the provisions of 22 C.F.R. 92.61 which anticipates a refusal of a witness to sign. That section of the Code of Federal Regulations says that if the witness refuses to sign, the consular officer should explain the reasons for the lack of signature, and that, with his explanation, "the deposition may then be used as though signed by the witness except when, on the motion to suppress, the court holds that the reasons given for the refusal to sign require the rejection of the deposition in whole or in part." I hold that the reasons here given do not require the rejec-

tion of the deposition, either in whole or in part. Moreover, 18 U.S.C. § 3503 which we have discussed earlier says that depositions in criminal cases taken under that section—depositions requiring personal knowledge of the witness—"shall be taken and filed in the manner provided in civil actions." Rule 30(e), F.R.Civ.P. covers the situation where a witness refuses to sign. It says that in such circumstances, "the officer shall sign it and state on the record . . . the fact of the refusal to sign together with the reason, if any, given therefore; and the deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32(d)(4) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part." Once more, the reasons don't require rejection. To say that a deposition taken under 18 U.S.C. §§ 3492, 3493 is inadmissible if not signed, but a more vital deposition taken under 18 U.S.C. § 3503 is admissible even though unsigned would be to place form above substance. The lack of Mr. Egger's signature to the transcript is unfortunate, but it is not fatal.

Defendant says that the conditions of the deposition were oppressive because of the presence of Jean-Louis Bryand. Nothing in the record supports this contention. In fact, it was only after his arrival that there was any deposition. This argument I hold is without merit.

■ Defendant says that he was prejudiced because questions had to be asked through Consul Rand. In fact, this situation didn't last long, and most of Mr. Almon's questions were responded to by Mr. Egger without having them repeated by Consul Rand. But, even if this were not so, when an interpreter is used, the questions are given to the interpreter to ask of the witness. This inconvenience doesn't invalidate the deposition.

18 U.S.C. § 3491 provides:

"Any book, paper, statement, record, account, writing, or other document, or any portion thereof, of whatever character and in whatever form, as well as any copy thereof equally with the original, which is not in the United States shall, when duly certified as provided in section 3494 of this title, be admissible in evidence in any criminal action or proceeding in any court of the United States if the court shall find, from all the testimony taken with respect to such foreign document pursuant to a commission executed under section 3492 of this title, that such document (or the original thereof in case such document is a copy) satisfies the requirements of section 1732 of title 28, unless in the event that the genuineness of such document is denied, any party to such criminal action or proceeding making such denial shall establish to the satisfaction of the court that such document is not genuine. Nothing contained herein shall be deemed to require authentication under the provisions of section 3494 of this title of any such foreign documents which may otherwise be properly authenticated by law."

■ I hold that with the exception of Commissioner's Exhibit A, Exhibit 41 and Exhibit 42–B, from all of the testimony taken with respect to the Swiss bank documents pursuant to the commission executed under 18 U.S.C. § 3492, the bank records have been authenticated under 28 U.S.C. § 1732; that they have been certified in accordance with 18 U.S.C. § 3494, and that a prima facie showing has been made which permits reception of the documents into evidence. If defendant so desires, the entire deposition will be received in evidence. If defendant opposes the introduction of the deposition itself, the admissibility of all or part of the deposition will be ruled on at trial. Additionally, I leave for trial determination the government's request that "findings of fact" be made as to the authenticity of the records. If the deposition itself is not read at time of trial, some explanation will have to be made to the jury as

**280**

to the authentication of the bank records, and, probably, as to the lack of authenticity of Exhibit 41. The nature and extent of the explanation will be decided upon on the basis of the record at trial time. I believe that 28 U.S.C. § 1732 can be utilized to prove a negative; i.e., that it can be used to establish that a record is not authentic, and, in that connection, I rely on United States v. DeGeorgia (1969), 9 Cir., 420 F.2d 889; Meeks v. State Farm (1972), 5 Cir., 460 F.2d 776; Bowman v. Kaufman (1967), 2 Cir., 387 F.2d 582, and Imperial Meat Co. v. United States (1963), 10 Cir., 316 F.2d 435. Just how this should be handled will have to await defendant's decision as to whether he wants the deposition read or not read, and, the ultimate decision as to the proper way to receive the exhibits must await trial for decision at that time based on the evidence as it develops. Additionally, defendant may make particularized objections at time of trial going to competency, relevancy or materiality of any of the exhibits.