**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John Robert HAY, Defendant-Appellant.**

**No. 75–1044.**

United States Court of Appeals, Tenth Circuit.

Argued Sept. 3, 1975.

Decided Dec. 31, 1975.

Certiorari Denied April 19, 1976.

See 96 S.Ct. 1666.

---

5. *See* 10 Wright & Miller Federal Practice and Procedure, Civil § 2728, pp. 554, 555, and cases cited in n. 47.

Edward B. Almon and David Barsotti, Denver, Colo., for defendant-appellant.

Richard Spelts, First Asst. U. S. Atty. (James L. Treece, U. S. Atty., Denver, Colo., James Graham, Dept. of Justice, Washington, D. C., on the brief), for plaintiff-appellee.

Before HILL, BARRETT and DOYLE, Circuit Judges.

HILL, Circuit Judge.

Appellant was convicted of conspiracy to defraud the United States in violation of 18 U.S.C. § 371.[1] Three co-conspirators, Robert Melloni, Pierre Vallee and Theophile Siuave, also were indicted, but were not United States citizens and have not been arrested. The events of the conspiracy and of appellant's arrest and trial were played against an international scenario. Venue was laid in the District of Colorado because it was appellant's last known residence in the United States. In this appeal he argues three grounds for reversal of his conviction. Appellant contends (1) that he was denied his right to a speedy trial, (2) that records of his secret Swiss bank account and a deposition taken to authenticate them were improperly admitted as evidence, and (3) that the evidence does not establish a crime against the United States. None of these contentions, in our opinion, warrants reversal of the conviction.

We will first summarize the evidence concerning the alleged conspiracy. In 1960, acting through the Agency for International Development (A.I.D.),[2] the United States loaned the government of South Vietnam $17,500,000 to help finance a new water system for the city of Saigon. The loan agreement required the creation of a government agency, the Saigon Metropolitan Water Office (Saigon), to supervise the construction and to operate the water system upon completion. The loan agreement gave A.I.D. extensive supervisory powers, including the right of approval of all contractors working on the project. Saigon was obligated to employ an engineering firm to design the water system and supervise its construction. Hydrotechnic Corporation of New York, New York, was selected by Saigon and approved by A.I.D. pursuant to the agreement. From 1961 through 1967, appellant was employed by Hydrotechnic as an engineer on the Saigon project at an average annual salary of $14,000.

A portion of the construction was contracted to a French corporation, Les Establissements Eiffel. Appellant was as-

---

1. In pertinent part § 371 states: "If two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. The loan was originally made by another agency which was merged into the Agency for International Development. For convenience we have referred to A.I.D. throughout.

signed by Hydrotechnic to supervise this work. Eiffel's contract price was $9,400,000 with a provision for the allowance of additional sums for cost overruns. Eiffel retained work worth $4,300,000 and subcontracted the rest. When construction was completed in 1966, Eiffel made claim for a $5,500,000 cost overrun. The government's evidence was that appellant agreed with three co-conspirators, all employees of Eiffel, to exert efforts to obtain the highest possible allowance on Eiffel's claim. During the last quarter of 1966, the conspiracy agreement was reduced to writing. At trial two witnesses testified to the existence and contents of the written agreement. Appellant agreed to approve all documents submitted by Eiffel in support of its claim and to keep co-conspirator Melloni, director of Eiffel's Saigon operation, informed as to the progress of the claim. In return appellant was to receive payment for his services based on the amount of the claim allowed. The invoices submitted to support the claim were falsified by altering invoices from Eiffel's suppliers on other projects to make them appear as expenses on the Saigon project.

When the Eiffel claim was submitted, an audit was required. An accounting firm was hired to conduct the audit and appellant was assigned to assist them with items requiring expertise in engineering. On the basis of the audit, Eiffel was allowed approximately $2,300,000 on its claim. This amount was paid directly by the Vietnamese government because the United States loan funds had already been exhausted. However, A.I.D. did pay the cost of the audit.

On October 2, 1967, the $2,300,000 was deposited in Eiffel's account at the Chase Manhattan Bank in New York City. On the same day, $538,000 of the deposit was transferred to the Chase Manhattan account of Theophile Siauve, an Eiffel employee and an indicted co-conspirator in this case. Transfers were then made from Siauve's account to two

secret accounts in the Union Bank of Switzerland in Geneva. One transfer, in the amount of $125,000, was to account No. 580.425 PL. Appellant was shown to be the owner of this account. This transaction completed the conspiracy.

We now set out the sequence of events relevant to appellant's contention he was denied a speedy trial. The possibility of criminal activity in obtaining the Eiffel cost overrun settlement was first discovered in January, 1969. This triggered a lengthy investigation extending into many foreign countries and encompassing interviews with over 100 persons. The investigation culminated with the confirmation of appellant's Swiss bank account through information obtained under a Swiss magistrate's search warrant. Because the bank refused to allow its officials to come to the United States and testify at a trial, the State Department had to negotiate with the Swiss government and the bank for the taking of a deposition under the provisions of 18 U.S.C. §§ 3491–94.[3] Upon reaching a tentative agreement, the government presented its evidence to a grand jury which returned an indictment on August 18, 1972.

In June 1972, the government had learned of appellant's presence in Mali, Africa, where he was working on another A.I.D. project. Because the United States has no extradition treaty with Mali, appellant was able to remain there for nine months after his indictment. He declined invitations from A.I.D. to return to the United States under the pretext of consultation about the Mali project. Finally, the State Department was able to negotiate an informal agreement with the government of Mali to have appellant declared *persona non grata*. Mali revoked his visa and its police shepherded him aboard a plane. As appellant's plane was about to land in New York, he was arrested by United States marshals who were conveniently aboard.

We consider the period of time from appellant's arrest on May 18, 1973,

---

**3.** These sections authorize the taking of depositions in criminal cases to authenticate foreign documents and provide the procedure for taking the deposition.

to his trial on October 13, 1974, the relevant period for determining whether his right to a speedy trial has been denied. We do not include the time from appellant's indictment to his arrest because appellant was not available for prosecution and because none of the interests protected by the sixth amendment guarantee were endangered during this time.[4] The constitution does not set a specific time limit for criminal trials; whether a defendant has been denied a speedy trial depends on the circumstances of the case.[5] In making the determination, the Supreme Court has suggested four primary factors be considered: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

We consider the 17 months from arrest to trial sufficient to invoke the *Barker* analysis. In this complex case, however, we do not believe the time lapse is long enough to weigh heavily in appellant's favor.[6] The record shows appellant steadfastly asserted his right to a speedy trial and that must be considered more strongly in his favor. Although these factors are worthy considerations, they are not dispositive. Whether appellant's right has been violated in this case depends primarily on balancing the reasons for delay against the prejudice to appellant.

Different reasons are given for two identifiable periods of delay. The first delay was initiated by the government's motion for the issuance of a commission to take a deposition in Switzerland to authenticate records of appellant's bank account. The second delay was to allow the government to obtain a witness who was unavailable for an earlier trial date.

Delay caused by the Swiss deposition procedure ultimately resulted in continuance of the trial to June 10, 1974—approximately 13 months after appellant's arrest. Appellant's claim a continuance to that date would deprive him of a speedy trial was considered by the trial court in *United States v. Hay,* 376 F.Supp. 264 (D.Colo.1974). Judge Winner found the circumstances of the case justified the delay. The circumstances were indeed extraordinary and presented both legal and diplomatic problems.

Depositions to authenticate foreign documents, including business records, have long been authorized by 18 U.S.C. §§ 3491–94, but such a deposition had never been taken in Switzerland and the statutes had never been interpreted in a reported opinion. As a result, unique problems were encountered. Some delay was necessary to protect appellant's right to confront the deposing witness. Although he later declined to attend in person, steps were taken to secure Justice Department payment of the travel expenses to Switzerland for appellant and his counsel and to obtain a special passport for appellant. Because Swiss law severely restricts the conduct of foreign judicial proceedings on Swiss soil, special permission had to be negotiated for the American consul to take the deposition. In addition, bank officials were reluctant to cooperate for fear of violating Swiss bank secrecy laws. Other misunderstandings arose because of differences in the two nations' laws. Swiss law has no counterpart to the right to confront witnesses; it has no hearsay rule and thus does not require the type of business record authentication necessary under American law. These and other problems were manifested when the deposition was finally taken on January 29, 1974. The witness from the bank

---

4. In this case the indictment was ordered sealed. Appellant was subject to neither restraints on his liberty nor public accusation before his arrest. *See United States v. Marion,* 404 U.S. 307, 92 S.Ct. 445, 30 L.Ed.2d 468 (1971).

5. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *United States v. Mer-*

*rick,* 464 F.2d 1087 (10th Cir. 1972), *cert. denied,* 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314.

6. "[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker v. Wingo,* 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

refused to answer certain questions and requested the assistant United States attorney be excluded from the proceedings. Additional delay was caused when the witness refused to sign the reporter's transcript of the deposition, and it was later returned to the trial court certified by the American consul, but unsigned by the deponent. The refusal to sign was also due to fear of violating Swiss criminal laws having no American equivalent.

The account we have given is but an outline of the reasons for the delay; it does not detail the extent of the delay attributable to each problem encountered. We should note there is no contention the deposition procedure was not pursued as expeditiously as possible.[7] We also note that some of the delay may be attributed to several pretrial motions filed by appellant.

After the deposition was taken, motions were made by both parties for a pretrial determination of the admissibility of the deposition and bank records as evidence. Appellant's motions for dismissal on speedy trial grounds were heard at the same time. The issues were briefed at length, orally argued, and subsequently decided by the court on April 30, 1974. We fully agree with the trial court's decision that delay through June 10, 1974, was justified under the circumstances. In its opinion the court stated: "[Appellant] has not shown that his ability to defend against the charges made is lessened because of the delay, and certainly there is no suggestion that the government has done anything other than to strive mightily to take the essential Swiss deposition at the earliest possible time . . . ." *United States v. Hay, supra* at 269.

Unfortunately, the delay was compounded by the government's May 2, 1974, motion to continue the June trial date to September 16, 1974. Because appellant's counsel had previous commitments in September, the trial was continued to, and commenced on, October 13, 1974. The reason for the final continuance was the unavailability of a government witness, Mrs. Duong Xuan Lang. She was about eight months pregnant in June, 1974, and unable to travel from her home in South Vietnam. At the hearing on the motion for continuance, the government represented to the court that Lang's testimony was essential and without her the government probably would have to dismiss the case. After hearing Lang's testimony at trial, the court expressed its opinion that her testimony was not essential and its concern that appellant may have been denied a speedy trial by the government's insistence on obtaining her presence.

We appreciate the trial court's concern over the final continuance when the witness sought did not turn out to be essential. We do not believe, however, that a witness must be absolutely indispensable to justify reasonable delay. Rather, this is another aspect of the balancing test and the delay must be commensurate with the relative importance of the witness.[8] In *Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192, the Court simply stated, "[A] valid reason, such as a missing witness, should serve to justify appropriate delay." In *Whitlock v. United States,* 429 F.2d 942, 945 (10th Cir. 1970), this court held the government's inability to locate a "necessary witness" justified delay that was not "unreasonably long." The District of Colorado Plan for Achieving Prompt Disposition of Criminal Cases, adopted pursuant to F.R.Crim.P. 50(b), provides that in extending the time limit for trial set in the plan, the court may consider: "The period of delay resulting from a

---

7. Appellant does contend the government had the time and should have made arrangements to take the deposition before he was apprehended. The facts of the matter indicate this clearly was not possible.

8. Although we believe this to be the correct constitutional approach, the new Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (88 Stat. 2076–89), may be more stringent. Section 3161(h)(3)(A) provides that in computing the time within which the trial must commence, the court may exclude: "Any period of delay resulting from the absence or unavailability of the defendant or an *essential witness.*)" (Emphasis added).

continuance granted at the request of the prosecuting attorney if: (1) the continuance is granted because of the unavailability of evidence material to the government's case. . . ." ·

■ Under these statements of the rule, Lang's testimony could justify some delay, albeit less than would be justified had the government's ill-advised representations been borne out at trial. Her testimony was certainly "material to the government's case." She was co-conspirator Melloni's personal secretary at Eiffel's Saigon office and was head of all secretaries there. She typed all "confidential communications" relating to the alleged conspiracy, including the written agreement with appellant. She testified to the contents of the agreement at trial. Lang's office was next to Melloni's so that appellant had to pass her desk whenever he came to confer with Melloni. Lang directly participated in the altering of invoices submitted to verify Eiffel's cost overrun claim. At trial several exhibits were introduced through her foundation testimony. She was able to identify code names used in communications relating to the conspiracy, including the use of the code name "Fernand" for appellant.

In addition to the substance of Lang's testimony, the nature of the rest of the government's case must be considered. None of the key government witnesses were residents of the United States. Most of them had to testify through interpreters, and many had been involved in criminal activity themselves. The government could not be certain in advance which witnesses would attend or what credibility the jury would give their testimony. We are convinced the government discharged its "constitutional duty to make a diligent, good-faith effort" to bring appellant to trial. *Moore v. Arizona*, 414 U.S. 25, 26, 94 S.Ct. 188, 190, 38 L.Ed.2d 183 (1973); *Smith v. Hooey*, 393 U.S. 374, 383, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969).

In reaching this conclusion we are not unmindful that appellant has suffered prejudice and that the ultimate responsibility for providing a speedy trial rests with the government. *Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); *Barker v. Wingo, supra*. The prejudice shown by appellant, in addition to the anxiety and concern usually attendant to pending criminal charges, is that he was unable to pursue his occupation as an engineer because that required him to work overseas. The terms of his bond restricted him to Colorado and his passport had been lifted. Preventing this harm is a primary concern of the speedy trial guarantee, *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *Barker v. Wingo, supra*, but it is not as important a consideration as impairment of the defense function. *United States v. Annerino*, 495 F.2d 1159 (7th Cir. 1974); *United States v. DeTienne*, 468 F.2d 151 (7th Cir. 1972), *cert. denied*, 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274. The test for determining when the right to a speedy trial has been violated is a balancing test and we believe the prejudice to appellant is outweighed by other factors.

■ Appellant's hardship diminishes in significance when placed in the context of the entire time expended in this prosecution. He engaged in a clever international conspiracy which took years to discover and investigate. When an indictment was returned, nearly five years after the crime, appellant remained out of the country and beyond prosecution for another nine months. Of the 17 months from arrest to trial, only three months were not absolutely essential to the preparation of the case for trial.[9] Even this final delay was not without good reason. Delay of this length is never desirable, but it is sometimes unavoidable. As noted 70 years ago by the Supreme Court: "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a de-

9. The delay to obtain the government witness totalled four months. Although we do not consider it crucial to the outcome of this case,

one month of that delay is attributable to the unavailability of appellant's counsel.

fendant. It does not preclude the rights of public justice." *Beavers v. Haubert,* 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950 (1905). Under the circumstances of this case, we hold appellant was not denied a speedy trial. We believe this holding is consistent with the rights of appellant and the rights of public justice.

■ Appellant raises several issues regarding the admission into evidence of the Swiss bank records and the deposition taken to authenticate them. Most of these issues were considered on pretrial motions in *United States v. Hay, supra.* In view of appellant's testimony at trial, however, it would be fruitless for us to consider these issues on appeal. Even if we could agree with appellant that error had been committed, we would be compelled to hold it was harmless. Any error in admitting evidence is cured by the defendant's admissions concerning the same facts. *Weeks v. United States,* 313 F.2d 688 (10th Cir. 1963), *cert. denied,* 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 421; *United States v. Haili,* 443 F.2d 1295 (9th Cir. 1971).[10] Every issue raised by appellant relates to either the authenticity of the bank records or the reliability of the testimony in the deposition taken to establish their authenticity. In his testimony on direct and cross-examination appellant not only admitted the authenticity of the bank records but also confirmed their accuracy.

Q. Now, Mr. Hay, did you during the month either late in September or early October of 1967, open a bank account at the Union Bank of Switzerland?

A. Yes.

Q. And did Melloni deposit or cause to be deposited in that account the sum of $125,000?

A. Yes, he did.

Q. I'm going to . . . direct your attention to the signature card of the Union Bank of Switzerland dated September 20, 1967, and where the name John Robert Hay appears in handwriting that's your signature, isn't it?

A. Yes, it is.

Appellant did not deny the existence of the account. In his defense he gave an alternative explanation of the source of the money and denied it was a payment in furtherance of the conspiracy. His admissions, however, have undermined any claim that he was prejudiced by the evidentiary use of the bank records or the deposition authenticating them.

■ Finally, appellant argues the evidence did not prove a crime against the United States. He claims the fraud, if any, was on the South Vietnamese government. In support of his contention, appellant emphasizes that the cost overrun claim was paid entirely by South Vietnam because the United States loan funds had been exhausted. Thus, he concludes whatever function the United States had in the loan transaction was already completed. We think the evidence shows a violation of the statute.

In interpreting the statute that is now 18 U.S.C. § 371, the Supreme Court established that: "[I]t is not essential that such a conspiracy shall contemplate a financial loss or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government." *Haas v. Henkel,* 216 U.S.

---

10. In *Weeks* we held it was harmless error to admit a bank signature card when defendant argued his signature was not adequately proved by the prosecution, but he had later admitted it was his signature on cross-examination.

In *Haili* defendant argued error in admitting telephone company records to show he made certain phone calls. Any possible error was held harmless because defendant took the stand and admitted making and receiving the calls in question. *See Beatty v. United States,* 357 F.2d 19 (10th Cir. 1966); *United States v. Smith,* 152 U.S.App.D.C. 229, 470 F.2d 377 (1972); *Ortiz-Jiminez v. United States,* 393 F.2d 720 (9th Cir. 1968).

462, 479, 30 S.Ct. 249, 254, 54 L.Ed. 569 (1910); *accord, Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966).

The United States clearly had a lawful function in connection with the Eiffel cost overrun claim. The United States has a fundamental interest in the manner in which projects receiving its aid are conducted. This interest is not limited strictly to accounting for United States Government funds invested in the project, but extends to seeing that the entire project is administered honestly and efficiently and without corruption and waste. *See United States v. Thompson,* 366 F.2d 167 (6th Cir. 1966), *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875. Pursuant to this interest the United States retained extensive supervisory powers in the loan agreement. Through A.I.D. it had the right of approval of the Eiffel cost overrun settlement. The United States paid for the audit and it had a right to have the audit conducted free from fraud. The United States was exercising a lawful government function and appellant's conduct was "calculated to obstruct or impair its efficiency and destroy the value of its operations." *Haas v. Henkel, supra,* 216 U.S. at 479, 30 S.Ct. at 254. This is fraud on the United States under 18 U.S.C. § 371 as charged in the indictment.

We have considered each of appellant's contentions and find none that warrant reversal of his conviction.

Affirmed.