**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William G. BURGIN, Jr. and David Flavous Lambert, Jr., Defendants-Appellants.**

No. 79–5304.

United States Court of Appeals, Fifth Circuit.

July 24, 1980.

William E. Spell, Jackson, Miss., for Burgin.

Joe O. Sams, Jr., Columbus, Miss., Henry Paul Monaghan, Boston, Mass., for Lambert.

Robert E. Hauberg, U. S. Atty., James B. Tucker, Asst. U. S. Atty., Jackson, Miss., Michael C. Farrow, Atty., Washington, D. C., for plaintiff-appellee.

Before AINSWORTH, INGRAHAM and GARZA, Circuit Judges.

GARZA, Circuit Judge:

In the Summer of 1975, Dr. Charles Helvey, Vice President of Learning Development Corporation (LDC), a Tennessee business concern formed to conduct behavioral modification programs, met Robert Broome. Mr. Broome inquired of Dr. Helvey if LDC had sought to sell its services in Mississippi. Although LDC's activities had been confined to Tennessee, Dr. Helvey became interested in the idea and a meeting in Jackson, Mississippi was arranged.

A few months later Dr. Helvey met with Mr. Broome and former Mississippi state senator Defendant David Flavous Lambert. It was suggested to Dr. Helvey that Defendant Lambert was familiar with Mississippi governmental affairs and could be helpful in LDC's relations with Mississippi agencies. Subsequently, LDC entered a contract with Bob Broome and Associates on a contingent basis to assist in its sale efforts. Broome and Associates, in turn, made an arrangement with Lambert to assist in contacting state agencies. Broome and Associates were to receive 50% of any amount received under contracts with Mississippi agencies.

Following arrangements made through Broome and Lambert, R. Lee Goodner, President of LDC, met with various state agencies seeking a contract for LDC services. After several meetings with officials of the Mississippi Department of Public Welfare (DPW), Mr. Goodner negotiated and entered into a $380,000 fixed price contract with Fred St. Clair, Commissioner of DPW, in which LDC was to provide services to various Head Start centers in Mississippi for the 1976–77 school year. The funding for this contract, as in the one which would follow the next year, was provided from 75% federal Title XX funds (42 U.S.C. § 1397 *et seq.*) and 25% from state funds. Pursuant to the prior arrangement, LDC paid Broome and Associates almost $190,000 in eight installments for the duration of this first contract.

Commissioner St. Clair had only recently assumed his position with DPW at the time of the LDC contract and felt that it would be in his department's best interest to cultivate a good relationship with Defendant-Senator William G. Burgin, Jr., Chairman of the State Senate Appropriations Committee. On several occasions in conversations between Defendant Burgin and St. Clair, Burgin inquired as to the status of the Head Start training program. In December of 1976, DPW delayed its payment to LDC and Burgin inquired of St. Clair whether any problems had been encountered.

In the early part of 1977, Goodner and Lambert approached St. Clair to negotiate a contract for the 1977–1978 school year. In May, 1977 a $480,000 contract was executed. The contract provided for similar services as the prior one but covered a larger geographical area. By the time this second contract went into effect, Broome's involvement with LDC had largely ended and his 50% portion of the DPW–LDC contract was paid to Development Associates, an Alabama corporation created by Lambert. Approximately $164,000 was paid to Development Associates under this second contract.

Prior to completion of the first contract, St. Clair decided to terminate the LDC program. However, St. Clair was contacted by Burgin and asked to wait until expiration of the first contract to make that determination whether to continue the program. In the Summer of 1977, LDC was requested by DPW to increase its performance bond to conform to that required of other con-

tractors. After being informed of this, Burgin indicated to St. Clair that there was no need for an increased bond. St. Clair relented and LDC's bond requirement stayed the same.

In the Fall of 1977 due to problems encountered with the LDC program, DPW delayed payments to LDC. On December 22, Defendant Burgin inquired as to the reason for the delay and asked DPW to prepare a check for LDC that day since LDC needed the money for Christmas. Burgin personally picked up the check for LDC.

In the Spring of 1978, LDC submitted its proposal for a third year. Commissioner St. Clair sent the proposal to the regional office of the United States Department of Health, Education and Welfare for approval. Burgin contacted St. Clair and encouraged St. Clair to get the proposal approved. Because of the federal investigation, the third contract was never entered into.

In summary, of the two DPW–LDC contracts amounting to $860,000, approximately $354,000 was paid out by LDC to either Bob Broome Associates or Development Associates. Of this amount, Broome received approximately $50,000; Lambert received approximately $220,000; and Burgin received approximately $83,000. The payments to Burgin came through monies paid to Lambert. Lambert and Burgin both testified that the funds paid to Burgin were in settlement of an outstanding debt owed by Lambert to Burgin and for Burgin's performance of legal services.

It is undisputed that Burgin prepared both the LDC–Bob Broome and Associates contract and the LDC–Development Associates contract and that he knew from the outset that 50% of the DPW–LDC funds would be paid to either Bob Broome and Associates or Development and Associates. It is also undisputed that some of the money paid to LDC was appropriated by the

Appropriations Committee of which Burgin was chairman. However, the appropriations were approved and recommended by the Appropriations' sub-committee of which Burgin was not a member and the full Senate voted for the appropriations as a body. Additionally, there is nothing to indicate that the appropriations were dealt with in a manner not routine and the use of the appropriated money was within the sole discretion of DPW officials.

Defendants Burgin and Lambert were indicted on two counts. Count I charged a violation of 18 U.S.C. § 371 by conspiring to defraud the United States Government of its governmental functions and the right to have the transaction of official business of the United States Department of Health, Education and Welfare conducted honestly, impartially and with integrity as the same should be conducted, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction.[1]

Count II charged a Hobbs Act violation of 18 U.S.C. §§ 1951 and 1952 in that Burgin and Lambert did obstruct, delay and effect commerce by extorting cash and negotiable instruments from LDC by the wrongful use of fear of economic loss and under color of official right.

A jury trial resulted in both defendant's acquittal on Count II and verdict of guilty as to Count I. Burgin was sentenced to fifteen months, Lambert was sentenced to twenty-four months, and both were fined $10,000. Burgin and Lambert have appealed raising several points of error.

## SUFFICIENCY of the INDICTMENT

Defendants, Burgin and Lambert, were charged with the second part of § 371 which, in broad terms, prohibits conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose . . ."[2] They argue that Count I is defective in that it fails to charge conduct

---

1. Count I is reproduced in entirety as an appendix.

2. 18 U.S.C. § 371 provides:

amounting to criminal conspiracy. Specifically, they contend that giving § 371 as broad a sweep as given in this case will render the statute constitutionally infirm because the supposed crime would not be defined until the statute was applied to the acts of the defendants. The question for our determination is whether the conduct charged in Count I plainly and unmistakably" falls within the proscription of § 371. *U. S. v. Porter*, 591 F.2d 1048, 1055 (5th Cir. 1979).

In *Hammerschmidt v. U. S.*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), the Supreme Court interpreted § 371:

> To conspire to defraud the United States means primarily to cheat the government out of property or money, *but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.* (emphasis added) 265 U.S. at 188, 44 S.Ct. at 512.

More recently, in *Dennis v. U. S.*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), the Court stated that § 371 reaches "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." It is now clear that the term "defraud" as used in § 371 not only reaches financial or property loss through employment of a deceptive scheme, but also is designed and intended to protect the integrity of the United States and its agencies, programs and policies. See *U. S. v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1965); *Haas v. Henkel*, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910); *Crawford v. U. S.*, 212 U.S. 183, 29 S.Ct. 260, 53 L.Ed. 465 (1909); *U. S. v. Brasco*, 516 F.2d 816 (2nd Cir. 1975), cert. den. 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975); *Shushan v. U. S.*, 117 F.2d 110 (5th Cir. 1941); *U. S. v. Sweig*, 316 F.Supp. 1148 (S.D.N.Y.1970).

In support of the indictment, the government argues that the meaning of "defraud" includes any scheme of "influence peddling" whereby a public official receives remuneration for the exertion of influence upon other officials in order for another to gain the upper hand in some financial transaction with the government. Although no pecuniary loss to the government has occurred, the government contends that the mere exertion of influence by a public official *having a covert financial interest* is a violation of § 371.

The defendants argue that to apply § 371 in circumstances where the government has suffered no pecuniary loss would amount to no more than a code of governmental ethics to be applied to any state official having some connection with federally funded projects. In support of their argument, the defendants rely heavily on *U. S. v. Porter, supra*, wherein this court held that if the government has suffered no pecuniary loss from the activities set forth in the indictment, the indictment can stand only if it alleges that some lawful function of the government has been impaired, obstructed or defeated. In the *Porter* case, the government contended that the United States had been defrauded of its right to have the Medicare program conducted honestly and fairly because of the business practices employed by the defendant doctors. This court held that where purely private parties were under no legal duty to act differently than they had been acting

Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

the government had failed to demonstrate interference with any of its lawful functions.

However, in *Porter,* this Court through Chief Judge Coleman, expressly recognized that "no public officials were bribed or *participated in the scheme."* 591 F.2d at 1055. The indictment in this case charged overreaching of an agent of the United States by a public official having a financial quid pro quo interest in a federally financed contract. If that allegation does not amount to obstruction of a lawful governmental function, it is hard to imagine an indictment which would. Therefore, we hold that the alleged involvement of Burgin and Lambert in a silent scheme whereby Burgin, in exchange for remuneration, was to use his political influence as an elected official to insure that state funds would be appropriated or to exert influence in his official capacity on various state officials in order to enable another to enter into or maintain contracts financed by federal funds, charges a violation of 18 U.S.C. § 371.

## SUFFICIENCY of the EVIDENCE

In a corollary to their attack of the indictment, the defendants complain that the evidence is insufficient to sustain their convictions. Reviewing sufficiency of the evidence questions we must view the evidence supporting the convictions in the light most favorable to the government and all credibility choices and inferences must be made in support of the jury's verdict. Although most of the evidence against the defendants is circumstantial, our test is whether reasonable minds could have found the evidence inconsistent with every reasonable hypothesis of the defendant's innocence.

In support of their contention, the defendants point to the evidence showing the legality and fairness of the DPW–LDC contracts. Indeed, the evidence clearly shows that no influence was directly exerted by Burgin upon the agent for the DPW in the initial contract negotiations with LDC. Although a conflict in testimony shows a dispute arose as to the quality of LDC's performance, the evidence establishes that LDC fully performed under the contracts and was entitled to full payment. In fact, it is undisputed that the DPW–LDC contracts were completely valid in a strict legal sense. Unfortunately, the arguments of defendants equate absence of pecuniary loss with absence of impairment, obstruction or defeat of the lawful functions of an agency of the government.

The thrust of the charges are that Burgin and Lambert conspired to impair and obstruct the government by using Burgin's official capacity to influence state appropriations and influence official action of the DPW. While virtually no evidence, direct or circumstantial, exists regarding Burgin's influence on the appropriations of money, there does exist evidence both of a Lambert-Burgin conspiracy and of Burgin's undue influence on St. Clair, the director of DPW. This wrongful influence constitutes the "defrauding" of the government. The overt acts of Lambert and Burgin in furtherance of the alleged conspiratorial objective are not disputed.

The testimony of St. Clair was that the first DPW–LDC contract was partly the result of Burgin's influence and that the second contract was due solely to Burgin's intercessions in the DPW's operation. The testimony was also clear that Burgin hindered the operations of DPW on several occasions which resulted in lessening the contractual performance of LDC and in expediting payments under the contracts. Although the defendants contended the payments from Lambert to Burgin were for legal services, the evidence was sufficient for the jury to infer that Burgin's influence was purchased in exchange for the money from Lambert. The fact that certain actions of either Burgin or Lambert, when viewed as separate occurrences, may not

have been illegal does not eliminate their illegality when together they constitute a plan of influence for pay the result of which is to deprive the government of the unobstructed operations of its federally funded program.

## ADMISSION of CO–CONSPIRATOR HEARSAY STATEMENTS

During the trial, the government was allowed to introduce hearsay statements of discussions between Lambert and others before any independent evidence of a conspiracy between Burgin and Lambert was introduced. The trial court properly gave cautionary instructions on the limited use of this hearsay testimony as set out in *U. S. v. Apollo,* 476 F.2d 156 (5th Cir. 1973). The defendants at trial objected to such procedure and urged that the panel decision in *U. S. v. James,* 576 F.2d 1121 (5th Cir. 1978), should control the admission of the statements.

While the en banc decision in *U. S. v. James,* 590 F.2d 575 (5th Cir. 1979), upheld but modified the panel decision, the trial in this case was conducted after petition for rehearing en banc was granted. The effect of the granting of rehearing en banc was to vacate the earlier panel decision. *U. S. v. Gutierrez-Barron,* 602 F.2d 722 (5th Cir. 1979); U.S. Ct. of App., 5th Cir., Rule 17. Additionally, the en banc decision specifically held the new procedure was to be only prospectively applied after the expiration of thirty days following the latter decision. Therefore, the defendant's point of error in this case must fail.

## MOTION for MISTRIAL

Following certain testimony regarding a meeting attended by Lambert and LDC's President Goodner, the trial court instructed the jury as to the use that could be made of the statements in regard to Burgin's guilt. At this point, Burgin's counsel moved for a severance because Goodner had not been named as a co-conspirator. The trial judge then stated:

Of course, Goodner is not named as a co-conspirator in Count I of the indictment, although the indictment charges each of the defendants with conspiring with each other and with others known and unknown to the grand jury and *he probably should have been named* . .

The defendants contend that this statement by the judge clearly indicated to the jury that a conspiracy did exist and therefore contaminated the jury's function of determining whether a conspiracy existed.

The government argues the statement most probably would not give the jurors the impression that a conspiracy existed, but rather that Goodner should have been indicted as a member of the *alleged* conspiracy. Furthermore, the government contends that if any harm was done, it was done to its case since it was the government, not defendants, which was relying on Goodner's testimony.

■ Certainly the comment was an error by the trial court. However, the statement occupied only a few seconds of the trial and the judge gave curative instructions to disregard the statement. We do not feel the trial court's comment so prejudiced the jury as to deprive defendants of a fair trial and, therefore, we find no reversible error. *U. S. v. Onori,* 535 F.2d 938 (5th Cir. 1976); *U. S. v. James,* 510 F.2d 546 (5th Cir. 1975).

## BILL of PARTICULARS

Defendant Lambert complains that the trial court erred in affirming the Magistrate's denial of all but three of Lambert's forty-three questions on Count I. Lambert claims he was unable to adequately prepare his defense due to the vague allegations of the indictment.

■ A defendant possesses no right to a bill of particulars and the decision on the motion lies within the discretion of the court. *Will v. U. S.,* 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); *U. S. v. Sher-*

*riff*, 546 F.2d 604 (5th Cir. 1977). The defendant has the burden of showing prejudice or a clear abuse of discretion.

 The function of a bill of particulars is to enable the defendant to prepare for trial and avoid prejudical surprise as well as providing protection against a subsequent prosecution for the same offense. *U. S. v. Murray*, 527 F.2d 401 (5th Cir. 1976). It is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial. *U. S. v. Sherriff, supra; Downing v. U. S.*, 348 F.2d 594 (5th Cir. 1965), *cert. denied*, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965). After reviewing Lambert's requests we conclude that the court below did not abuse its discretion nor has Lambert shown prejudice in the denial of part of his motion.

## LEGISLATIVE PRIVILEGE

Defendant Burgin argues that Rule 501 of the Federal Rules of Evidence recognizes the existence of a common law privilege barring use of any of his official legislative acts as evidence against him. However, the recent decision of the Supreme Court in *U. S. v. Gillock*, —— U.S. ——, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), holds, that in a federal criminal prosecution against a state legislator, Rule 501 provides no legislative privilege barring the introduction of evidence of the legislative acts of the defendant. Burgin's argument is without merit.

## CONCLUSION

A fair summary of the evidence presented by the government shows that Defendant Burgin, a state senator and Chairman of the appropriations committee, and his associate, Defendant Lambert, a former state senator, being aware that 50% of the Learning Development Corporation charges to the Department of Public Welfare were being paid indirectly and later directly to Lambert with a large portion going to Burgin, used their influence in assuring that Learning Development Corporation obtain-

ed and retained its contract with the Department of Public Welfare. Aware of this, Burgin should have advised the Department of Public Welfare that the contract could have been entered for much less. However, he failed to do so and conspired with Lambert to keep the Department ignorant of his personal gain from the transactions. This exemplifies influence peddling of the rankest kind.

AFFIRMED.

### Appendix

The Grand Jury charges:

### COUNT I

1. That from on or about April, 1975, and continuously thereafter up to and including the date of the filing of this indictment, in the Southern District of Mississippi, and elsewhere, WILLIAM G. BURGIN, JR. and DAVID FLAVOUS LAMBERT, JR., defendants herein, knowingly and willfully did conspire and agree together, and with each other, and with other persons known and unknown to the Grand Jury, not named as defendants herein, to defraud the United States of and concerning its governmental functions and rights, that is, of and concerning its right to have its business and its affairs, and particularly the transaction of the official business of the United States Department of Health, Education, and Welfare, conducted honestly, impartially, and with integrity as the same should be conducted, free from corruption, fraud improper and undue influence, dishonesty, unlawful impairment and obstruction.

2. That from on or about October 1, 1975, to the date of the filing of this indictment, there was in existence a program of federal financial assistance whereby the United States, through the Secretary of the Department of Health, Education, and Welfare, would provide funds to the various States for social service endeavors, such program being established by and described in Title XX of the Social Security Act, as amended, specifically Sections 1397 *et seq.*,

Title 42, United States Code, with the monies received by the States being commonly referred to as "Title XX funds."

3. That at all times material herein, the State Department of Public Welfare was an administrative agency of the State of Mississippi and as such was responsible for the administration of funds received from the United States pursuant to the program described in Paragraph 2 hereinabove.

4. That at all times material herein, Learning Development Corporation was a business entity incorporated under the laws of the State of Tennessee having its principal offices in the State of Tennessee and established to provide educational and training services in the fields of learning deficiencies, behavior modification, and motivation enhancement.

5. That from on or about October 1, 1976, to on or about June 30, 1978, Learning Development Corporation possessed a contract with the State Department of Public Welfare by which Learning Development Corporation agreed to administer various social service programs with remuneration to Learning Development Corporation from the State Department of Public Welfare to consist in large part of funds received by the State of Mississippi pursuant to the program described in Paragraph 2 hereinabove.

6. That at all times material herein, WILLIAM G. BURGIN, JR. was a Mississippi State Senator and Chairman of the Mississippi State Senate Appropriations Committee.

7. That it was part of the conspiracy described in Paragraph 1 hereinabove that DAVID FLAVOUS LAMBERT, JR. would assist in the conduct of the affairs of Learning Development Corporation concerning its contractual relationships within the State of Mississippi.

8. That it was a further part of the conspiracy that WILLIAM G. BURGIN, JR., would use and exert his position and influence as a State Senator and Chairman of the Mississippi State Senate Appropriations Committee upon Fred W. St. Clair, Commissioner of the State Department of Public Welfare, and other State of Mississippi officials in order to enable Learning Development Corporation to obtain and maintain contracts with the State of Mississippi and its agencies.

9. That it was a further part of the conspiracy that WILLIAM G. BURGIN, JR., would use and exert his position and influence as a State Senator and Chairman of the Mississippi State Senate Appropriations Committee to insure that state appropriations were available and sufficient to enable the State of Mississippi and its agencies to obtain and maintain contracts with Learning Development Corporation.

10. That it was a further part of the conspiracy that a portion of the remuneration received by Learning Development Corporation pursuant to it contracts with the State of Mississippi and its agencies would be funds obtained by the State of Mississippi from the United States.

11. That it was a further part of the conspiracy that DAVID FLAVOUS LAMBERT, JR. would obtain from Learning Development Corporation a portion of the remuneration received by Learning Development Corporation pursuant to its contracts with the State of Mississippi and its agencies.

12. That it was a further part of the conspiracy that the monies obtained by DAVID FLAVOUS LAMBERT, JR., from Learning Development Corporation would be distributed among DAVID FLAVOUS LAMBERT, JR., WILLIAM G. BURGIN, JR., and, at times, other persons known and unknown to the Grand Jury.

13. That it was a further part of the conspiracy that the financial interests of WILLIAM G. BURGIN, JR., as described hereinabove, would be concealed from the knowledge of State of Mississippi officials as well as the knowledge of the general public.

## OVERT ACTS

In furtherance of the conspiracy and to promote and accomplish its objectives, the co-conspirators committed certain overt acts in the Southern District of Mississippi and elsewhere, including:

1. In late 1975 or early 1976, DAVID FLAVOUS LAMBERT, JR. met with R. Lee Goodner, Jr., President of Learning Development Corporation, to discuss the possibility of Learning Development Corporation obtaining a contract in the State of Mississippi.

2. In or about April, 1976, DAVID FLAVOUS LAMBERT, JR. attended a meeting with officials of the State Department of Public Welfare at which the interest of Learning Development Corporation in securing a contract was discussed.

3. In or about August, 1976, WILLIAM G. BURGIN, JR. met with Fred W. St. Clair and sought his support for Learning Development Corporation's proposed contract.

4. In or about October, 1976, WILLIAM G. BURGIN, JR. met with Fred W. St. Clair, again seeking support for Learning Development Corporation.

5. On or about November 23, 1976, DAVID FLAVOUS LAMBERT, JR. executed a check payable to WILLIAM G. BURGIN in the approximate amount of $2,834.00.

6. On or about December 14, 1976, DAVID FLAVOUS LAMBERT, JR. executed a check payable to WILLIAM G. BURGIN in the approximate amount of $13,838.00.

7. In late 1976 or early 1977, WILLIAM G. BURGIN, JR. called Fred W. St. Clair and inquired about the performance of Learning Development Corporation.

8. On or about February 8, 1977, DAVID FLAVOUS LAMBERT, JR. executed a check payable to WILLIAM G. BURGIN in the approximate amount of $4,346.00.

9. On four to six occasions, in 1977, DAVID FLAVOUS LAMBERT, JR. presented a check drawn on the account of Learning Development Corporation and payable to "Bob Broome and Associates" to an employee of the Fidelity Bank, Jackson Mississippi, requesting a five thousand dollar cash payment and deposit of the remainder in the accounts of Lambert and Bob Broome.

10. In or about the spring of 1977, WILLIAM G. BURGIN, JR. called Fred W. St. Clair and expressed concern over difficulties being experienced in negotiations between Learning Development Corporation and the State Department of Public Welfare.

11. In or about August, 1977, WILLIAM G. BURGIN, JR. had a conversation with Fred W. St. Clair expressing dismay over the bonding requirements being imposed upon Learning Development Corporation.

12. In the late summer of 1977, WILLIAM G. BURGIN, JR., had a conversation with Fred W. St. Clair informing St. Clair not to be concerned over the Budget Commission's recommendation for the State Department of Public Welfare budget because additional funds could be added by the State Senate if necessary.

13. On or about December 22, 1977, WILLIAM G. BURGIN, JR. obtained a check from the State Department of Public Welfare intended as payment to Learning Development Corporation.

14. On or about December 30, 1977, DAVID FLAVOUS LAMBERT, JR. executed a check payable to WILLIAM G. BURGIN in the approximate amount of $8,500.00.

15. On or about February 2, 1978, DAVID FLAVOUS LAMBERT, JR. executed a check payable to WILLIAM G. BURGIN in the amount of $8,506.00.

16. On or about March 1, 1978, DAVID FLAVOUS LAMBERT, JR. executed a check payable to WILLIAM G. BURGIN in the approximate amount of $6,182.00.

17. During the first half of 1978, WILLIAM G. BURGIN, JR. met with Fred W. St. Clair inquiring whether a $750,000 state appropriation would be sufficient to fund a future Learning Development Corporation contract.

18. On or about March 23, 1978, DAVID FLAVOUS LAMBERT, JR. executed a check payable to WILLIAM G. BURGIN in the approximate amount of $8,600.00.

19. In or about May, 1978, DAVID FLAVOUS LAMBERT, JR. met with Fred W. St. Clair and expressed his chagrin over the fact that St. Clair had sent a proposed contract with Learning Development Corporation to the regional office of the United States Department of Health, Education and Welfare.

All in violation of Section 371, Title 18, United States Code.