**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William M. CONOVER and Anthony R. Tanner, Defendants-Appellants.**

**Nos. 84–3431, 84–3876.**

United States Court of Appeals, Eleventh Circuit.

Sept. 30, 1985.

---

James C. Hill, Circuit Judge, filed specially concurring opinion.

Richard A. Lazzara, Tampa, Fla., for W. Conover.

Stephen D. Milbrath, David R. Best, Orlando, Fla., John DeVault, III, Jacksonville, Fla., for A. Tanner.

Terry Zitek, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before HILL and ANDERSON, Circuit Judges, and GARZA*, Senior Circuit Judge.

GARZA, Senior Circuit Judge:

A jury convicted William M. Conover and Anthony R. Tanner of conspiring to defraud the United States in violation of 18 U.S.C. § 371, and committing various acts of mail fraud in connection with the conspiracy in violation of 18 U.S.C. § 1341. Conover and Tanner have appealed, arguing that the district court abused its discretion in refusing to investigate allegations of juror misconduct; that the conspiracy count of the indictment failed to charge a crime against the United States; that the evidence is insufficient to support the mail fraud convictions; and that the district court made various evidentiary rulings which warrant reversal. We affirm the convictions.

I

Seminole Electric Cooperative, Inc. ("Seminole"), is a Florida corporation owned by several rural electric cooperatives located in central Florida. In 1979, Seminole borrowed over $1.1 billion from the Federal Financing Bank, which is an agency of the United States Treasury, for the purpose of constructing a coal-fired power plant near Palatka, Florida. The loan was guaranteed by the Rural Electrification Administration ("REA"), which is an agency of the United States Department of Agriculture. The REA administers a guaranteed loan program for eligible rural electric cooperatives. Conover was employed as Seminole's manager of procurement.

Construction of the plant began in September 1979. In order to install a transmission line running from the plant to a substation located outside of Ocala, Florida, it was first necessary to build a fifty-one mile patrol road. The patrol road had to be made of materials which would support heavy trucks and resist flooding. The construction contract for the patrol road was originally awarded to Journagan Construction Company ("Journagan").

Journagan encountered problems soon after construction of the road began. It had been assumed that Journagan would be able to use sand located in the area where the road was being built. As it turned out, however, the sand would not compact to a density sufficient to support even light-weight vehicles. Seminole hired the engineering consulting firm of Ross and Associates ("Ross") to evaluate the situation. Ross suggested that the natural sands be used as the primary fill material, and then topped with a sand-clay mixture which would be more cohesive and stable. Journagan began to implement this method, but soon encountered difficulty in obtaining sufficient amounts of clay.

A meeting was held at Seminole's Tampa office in March 1981. The purpose of the meeting was to discuss ways of accelerating the construction project. The problem of obtaining adequate fill materials for the patrol road was also discussed. During

---

the meeting, Richard Sherrill, Seminole's supervisor of transmission engineering, instructed Conover to locate sources of fill material. Journagan representatives indicated that they had not attempted to locate alternative fill materials. They also indicated that the contract price would have to be increased substantially in order for them to complete the road. Journagan's contract was subsequently terminated.

Following the meeting, Conover called Tanner. Tanner owned a limerock mine, and was also involved in the real estate development business. Tanner and Conover discussed the possibility of using limerock and limerock overburden as an alternative fill material. Limerock overburden in a material which is generally found above limerock deposits. On March 26, 1981, at Conover's request, Seminole engineer Ken Bachor examined the fill material available at Tanner's Citra Mine. Bachor later advised Sherrill that the material would be adequate for the project. Sherrill subsequently issued a purchase order to acquire enough limerock overburden to keep construction underway. Conover did not investigate any other sources of alternative fill materials.

Tanner and Conover were friends, and had gone on several fishing trips together. They had flown to the Bahamas together in Tanner's private plane in 1980. In May 1981 Conover purchased a condominium from Crystal River Investors, a company owned by Tanner. Tanner loaned Conover $6000 so that Conover could close on the condominium; this money was repaid in June 1981. Previously, in January 1981, Conover had contracted with Tanner to perform landscaping work and install a sprinkler system at the condominum complex for a fee of approximately $13,750. On March 9, 1981, Tanner gave Conover a check for $10,035 which was allegedly made in partial payment of the money owed under the landscaping contract. Conover received a total of $15,000 under the landscaping contract. The record does not reflect how much of the $15,000 was profit.

With Journagan no longer working on construction of the patrol road, it became necessary to award a new contract for the construction of the patrol road through Seminole's formal competitive bidding procedure. Seminole decided not to award just one contract for the patrol road project as it had done with Journagan. Instead, the company decided to bid out two separate contracts: one to provide fill material and one to provide for the spreading of the fill material. The specifications for the fill material described in the contract were drawn up by Seminole's procurement department. The specifications stated that the fill material had to have a limerock content of at least twenty percent. This requirement worked in favor of Tanner for several reasons. First, the Citra Mine was relatively undeveloped. That is, there was a great deal of overburden still present above the limerock deposits; consequently, it would be easy for Tanner to remove the overburden, then mix in only the minimum amount of limerock necessary to meet the specifications required by the contract. Second, the contract specifications excluded contractors who could have made bids had the contract required the use of a sand and clay mixture rather than a limerock mixture. Additionally, one contractor complained that the time period in which bids had to be submitted was too short. Tanner submitted the lowest of several bids made on the fill contract, and was awarded the job. Tanner also made the lowest bid on the spreading contract, and was awarded that job as well.

More problems arose after Tanner began working on the road. First there was a dispute as to which party, Seminole or Tanner, was required to maintain the access roads leading to the patrol road. Conover and another Seminole employee advised Kenneth Bachor, Seminole's manager of transmission engineering, that the contract was ambiguous, and that Seminole should pay; Seminole ended up paying the costs of maintaining the access roads. Subsequently, REA complained that the bond provided by Tanner was unacceptable because the bonding company was not on the Treasury

Department's list of approved sureties. In a letter dated July 17, 1981, Conover told another bonding company that the patrol road had been "essentially" completed, and that the work had been performed in a satisfactory manner. In another letter dated July 6, 1981, Conover stated that fifty percent of the road had been completed. In fact, the road was less than half finished at that time. It was also learned that limerock weakens when it becomes wet; consequently, the limerock mixture could not be used in areas subject to water flooding. As a result, "clean sand" had to be substituted in high-water areas. Tanner charged $4.75 for each cubic yard of fill material delivered and spread; Journagan had been charging only $3.82 per cubic yard of pure sand delivered and spread. The patrol road was completed in October 1981.

Prior to the time the road was completed, in June 1981, representatives of the Withlacoochie Rural Electric Cooperative, Inc., which was a member of the Seminole cooperative, demanded that Seminole terminate all business relations with Tanner. This demand was based on alleged improprieties in the manner in which the contracts with Tanner had been awarded. Federal authorities were investigating the situation by November 1981. Conover was subsequently suspended, then demoted, for violating Seminole's conflict of interest policies.

Tanner and Conover were first indicted in June 1983. The six week trial that followed resulted in a hung jury, and a mistrial was declared. Tanner and Conover were subsequently reindicted on a five count indictment. Count I alleged that Tanner and Conover had conspired to defraud the United States in violation of 18 U.S.C. § 371; counts II through V alleged separate instances of mail fraud in violation of 18 U.S.C. § 1341. Conover was convicted on all counts. Tanner was convicted on counts I, II, IV, and V. Two motions for new trial based on allegations of jury misconduct were filed; both were denied.

II

Appellants' first contention is that the district court erred in refusing to conduct an evidentiary hearing for the purpose of investigating claims of jury misconduct. The factual underpinnings supporting this contention are somewhat unusual. Allegations of jury misconduct were originally pressed by the appellants while their motion for new trial was still pending. In a sworn affidavit, Tanner's attorney stated that he received an unsolicited phone call from a juror. The juror told Tanner's attorney that several members of the jury had been drinking during the lunch recess, and that several jurors had fallen asleep during the trial. The district court considered the affidavit, heard arguments on the matter, and denied the motion for new trial.

Subsequently, and while the appeal of the case was pending in this court, Tanner filed, and Conover joined in, a motion for new trial based on newly discovered evidence of jury misconduct. In another affidavit, Tanner's attorney stated that on October 13, 1984, he received an unsolicited visit (at his residence) from a second juror. This juror was formally interviewed, presumably at the request of Tanner's attorney, by two private investigators on October 15. The interview was transcribed; the transcript was sworn to by the juror, and attached to the motion for new trial.

During the interview, the juror made a number of alarming allegations concerning the conduct of the jurors. He said that "the jury was one big party," and that several jurors, himself included, drank beer and smoked marijuana during the noon recess. He also stated that two of the jurors had on occasion injested cocaine during the noon recess, and that he had learned that one of these two jurors had offered to sell the other a quarter-pound of marijuana. He also indicated that he had voluntarily come forward with this information to clear his conscience, and that he had not received or been promised any type of remuneration for his statement. The trial court denied the motion for new trial based on this

newly discovered evidence without first conducting an evidentiary hearing.

▇▇▇ The decision to investigate allegations of jury misconduct rests within the sound discretion of the district court. *See U.S. v. Darby,* 744 F.2d 1508, 1540 (11th Cir.1984). "[T]here is no *per se* rule requiring an inquiry in every instance." *Id.* (quoting *U.S. v. Barshov,* 733 F.2d 842, 851 (11th Cir.1984)). When an evidentiary hearing is conducted, the inquiry is limited to determining "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *See* FED.R.EVID. 606(b). The affidavit supporting appellants' motion for new trial does not allege that prejudicial information was brought to the jury's attention. Similarly, it does not allege that any outside influence was brought to bear upon any juror. Even if the allegations of substance abuse were true, there is no "adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *Barshov,* 733 F.2d at 851. Thus, the district court was under no duty to investigate the allegations, and did not abuse its discretion in refusing to conduct an evidentiary hearing.

### III

▇▇ Appellants next contend that the indictment failed to charge, and the evidence did not establish, a conspiracy to defraud the United States. It is argued that a conspiracy to defraud the United States must involve a knowing violation of a federal agency's rules, regulations, or procedures.[1] The law does not, however, require such a showing.

Count I of the indictment charged appellants with violating 18 U.S.C. § 371. Section 371 provides in relevant part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof *in any manner or for any purpose,* and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 371 (emphasis added). The Supreme Court has construed section 371 as reaching "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966). The Court has also explained what types of fraud are contemplated by the statute:

To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

*Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924).

The conspiracy count in this case charged appellants with conspiring to defraud the government by "impeding, impairing, obstructing and defeating the lawful functions of the Rural Electrification Administration in its administration and enforcement of its guaranteed loan program." Count I also alleged twenty-five

---

**1.** In connection with this assertion, appellants argue that the district court erred in excluding a letter from an REA representative to Harry Wright, Seminole's general manager. The letter stated that Seminole was not required to obtain REA approval of two of the contracts which had been awarded to Tanner. The letter also states that the bidding procedures used for those contracts did not require REA approval. Had the government been required to show a knowing violation of an REA rule, regulation, or procedure, the letter would have clearly been admissible. In light of our rejection of that contention, however, we fail to see the error in its exclusion.

overt acts committed in furtherance of the conspiracy. Listed among these overt acts were the questionable business transactions which gave rise to this case. The evidence is clearly sufficient to support the conclusion that these transactions occurred.

■■■ Appellants suggest that these transactions showed, at the most, violations of Seminole's conflict of interest policy, not the existence of a conspiracy to defraud the REA. We reject appellants' contention that the indictment failed to charge a crime under section 371. There is no requirement in the statute, or in the cases construing the statute, that the object of the conspiracy must be to cause a financial loss to an agency of the government. *United States v. Burgin,* 621 F.2d 1352, 1356 (5th Cir.1980); *United States v. Anderson,* 579 F.2d 455, 458 (8th Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). Nor is there any requirement that the indictment charge a knowing violation of an agency's rules, regulations, or procedures. The statute is designed "to protect the integrity of the United States and its agencies, programs, and policies." *Burgin,* 621 F.2d at 1356. Moreover, "[t]he United States has a fundamental interest in the manner in which projects receiving its aid are conducted. This interest is not limited strictly to accounting for United States Government funds invested in the project, but extends to seeing that the entire project is administered honestly and efficiently and without corruption and waste." *United States v. Hay,* 527 F.2d 990, 998 (10th Cir.1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976) (citing *United States v. Thompson,* 366 F.2d 167 (6th Cir.1966), *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967)). It is undisputed that the money used to construct the power plant was borrowed from the Federal Financing Bank, which is an agency of the United States Treasury; nor is it disputed that the loan

was guaranteed by the REA, which is also an agency of the federal government. The evidence supports the conclusion that Tanner and Conover engaged in collusive and dishonest business practices. This constituted a fraud on the United States under section 371.

## IV

Appellants next contend that the evidence is insufficient to support their convictions [2] on the mail fraud violations alleged in counts II through V. The mail fraud statute, 18 U.S.C. § 1341, prohibits the use of the mails for the purpose of executing any scheme or artifice to defraud. The indictment charged that appellants used the mails for the purposes of (1) defrauding "the United States by impeding, impairing, obstructing and defeating the lawful function of the [REA] in its administration and enforcement of its guaranteed loan program;" and (2) defrauding Seminole "of its right to have its process and procedures for the procurement of materials, equipment and services run honestly and free from deceit. . . ."

Appellants argue that the convictions on counts II through V can be upheld only if the evidence establishes that they used the mails in effectuating a scheme to defraud Seminole. This is so, appellants contend, because the indictment did not charge, and the evidence did not establish, a violation of 18 U.S.C. § 371. We have already rejected this proposition. Thus, we need not reach the question of whether the evidence establishes the use of the mails for the purpose of effectuating a scheme to defraud Seminole. The convictions can be affirmed if the evidence establishes the use of the mails in effectuating a scheme to defraud the United States by "impeding, impairing, obstructing and defeating the lawful function of the [REA] in its administration and enforcement of its guaranteed loan program" as charged in counts II through V. In other words, the mail fraud convictions

---

**2.** Conover was convicted on each of the mail fraud violations alleged in counts II through V. Tanner was convicted on the mail fraud viola-

tions alleged in counts II, IV, and V; he was acquitted on count III.

should be affirmed if the evidence establishes the use of the mails in connection with the section 371 violation alleged in count I.

■ Appellants do not contend that the mailings referred to in counts II through V did not occur. Nor is it argued that these mailings were not made in connection with the transactions which support their convictions on count I of the indictment. In order for the mail fraud convictions to stand, it must be shown that the use of the mail played an "integral" role in the scheme. *See United States v. Bosby*, 675 F.2d 1174, 1183 (11th Cir.1982) (citing *United States v. Bethea*, 672 F.2d 407, 410 (5th Cir.1982)). The government contends that the mailings played an integral role in the scheme by tending to create an "aura of legitimacy," *see Bosby*, 675 F.2d at 1183, around the transactions. We agree. Consequently, we affirm Conover's convictions on counts II through V, and Tanner's convictions on counts II, IV, and V.

## V

■ Lastly, appellants argue that the district court made a number of erroneous evidentiary rulings. First, appellants point to seventeen instances in which the district court excluded evidence tending to prove that the materials supplied by Tanner were adequate and reasonably priced. We fail to see the relevancy of this evidence. The government's case was based on allegations of commercial bribery and bid-rigging; whether Seminole received a good bargain as a result of this conduct simply has no bearing on whether these activities actually occurred. The district court did not err in excluding this evidence.

■ Appellants next contend that the district court improperly limited their cross-examination of government witness Albert Guthrie. During the cross-examination of Guthrie, the defense brought out that Guthrie was being investigated for criminal tax fraud, that he was testifying under a grant of use immunity and that he was testifying pursuant to a court order. Guthrie also stated that in his opinion, he would

not be prosecuted for tax fraud because he agreed to testify. Guthrie denied that he was under investigation for anything else, and denied that he had told anyone that he was under investigation for anything else. Appellants argue that the district court abused its discretion in not permitting defense counsel to continue to interrogate Guthrie concerning other investigations. We disagree. Guthrie had already denied having knowledge of any other investigation. Moreover, the district court had already permitted a wide range of cross-examination concerning Guthrie's promise of use immunity. The district court's ruling did not constitute an abuse of discretion.

■ Appellants' last contention concerns the testimony of Donald Gilbert, a private investigator who had been hired to investigate the relation between Tanner and Conover. The district court permitted Gilbert to testify that after making his investigation, he concluded that there was "collusion" between Conover and Tanner. In light of the context in which this statement was made, the length of the trial, and the other evidence supporting the conclusion that there was collusion between Tanner and Conover, we conclude that the error, if any, in the admission of this testimony was harmless. *See* FED.R.CRIM.P. 52(a).

## VI

For the reasons set forth above, the convictions are affirmed.

AFFIRMED.

JAMES C. HILL, Circuit Judge, specially concurring:

Although I do not believe 18 U.S.C. § 371 should be construed to penalize the conspiracy proved in this case, I concur in the judgment of the court because this panel is bound by the decision of the Fifth Circuit in *United States v. Burgin*, 621 F.2d 1352 (5th Cir.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980), which is inconsistent with the views I express below.

Section 371 criminalizes conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose." It does not criminalize a conspiracy to defraud a private party. The evidence in this case was sufficient to prove that the defendants conspired to defraud Seminole Electric. In my view, however, the prosecution did not prove a conspiracy to defraud the government of the United States.

It has long been the case that the prosecution need not show any monetary or property loss to the federal government to sustain a conviction for conspiracy to defraud the United States under section 371. *Haas v. Henkel,* 216 U.S. 462, 479, 30 S.Ct. 249, 253, 54 L.Ed. 569 (1910). In *Hammerschmidt v. United States,* 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), the Supreme Court announced that to prove a violation of section 371, "[i]t is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention." 265 U.S. at 188, 44 S.Ct. at 512. More recently, the Court reiterated that the statutory language reaches "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) (quoting *Haas v. Henkel,* 216 U.S. at 479, 30 S.Ct. at 254). No Supreme Court decision has upheld a conviction under section 371, however, where the defendants neither defrauded the federal government of its funds or property nor interfered with United States government officials or their agents performing an official function of the federal government.

As the court's opinion in this case notes, Seminole Electric was the recipient of a loan made by one federal government agency and guaranteed by another. Moreover, as would be expected in any such lending arrangement, the federal government was entitled to exercise a significant degree of control over the means by which the funds it was providing would be utilized. Intellectual honesty compels me to find those facts sufficient to bring the fraud committed in this case within the ambit of section 371, as that statute was construed by the Fifth Circuit in *Burgin v. United States,* 621 F.2d 1352. In *Burgin* the government proved that the defendants, who included a state senator, conspired to use the senator's position in state government to exert undue influence upon officials of the state agency responsible for administering a Head Start training program in that state. The court quite aptly described the scheme designed and executed by the defendants as "influence peddling of the rankest kind." The federal government provided 75% of the funding for the state contracts that were improperly sought and retained by the defendants in that case, and the United States Department of Health, Education and Welfare apparently was entitled to approve the proposals that were later reduced to contracts between the state and the company the conspirators were seeking to benefit. Although the defendants did not conspire to exert any influence whatsoever, undue or otherwise, upon the federal government, and no pecuniary loss to the government was shown, the court nonetheless upheld their conviction under section 371 for conspiracy to defraud the United States.

According to the court's opinion in *Burgin,* "[t]he indictment in this case charged overreaching of an agent of the United States by a public official having a financial quid pro quo interest in a federally financed contract." 621 F.2d at 1357. Of course, where a state or private party is simply acting as an agent of the United States government in the implementation of a truly federal program, a fraud upon the agent may constitute a fraud upon the United States. But in my view, the courts should not generally find such an agency relationship in the absence of compelling evidence that the state or private party was in fact defrauded while acting as a mere agent of the federal government performing a constitutionally legitimate and duly

authorized function of the federal government, rather than as a non-federal entity receiving some form of federal assistance. Complete ownership or control of a nominally private entity by the federal government might serve as evidence of such a relationship. *See United States v. Walter*, 263 U.S. 15, 18, 44 S.Ct. 10, 11, 68 L.Ed. 137 (1923) (holding statute reached conspiracy to defraud the United States Emergency Fleet Corp., of which the United States owned 100% of the stock, where "the contemplated fraud upon the corporation if successful would have resulted directly in a pecuniary loss to the United States, and even more immediately would have impaired the efficiency of its very important instrument"). Extensive federal regulation of the state or private entity's activities on behalf of the federal government would also tend to support a conviction under section 371 for committing a fraud most directly upon a private party, but indirectly upon the federal government as well. *See United States v. Gold*, 743 F.2d 800 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985), (upholding conviction for defrauding the United States in violation of section 371 by conspiring to file false Medicare claims with private intermediary that received, adjudicated and paid such claims under contract with federal government agency). Federal government assistance, however, accompanied by only a modicum of federal supervision of the non-federal entity's activities, seems patently insufficient to render a fraud upon that entity a fraud upon the United States.

By artful lawyering, one might easily blur the distinction between the United States government and those receiving its support beyond clear recognition. Courts must always remain mindful, however, of the admonition that penal statutes are to be strictly construed, a rule that is "perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820) (Marshall, C.J.). That well-known rule of construction is but a corollary to the comparably venerable "void for vagueness" doctrine of constitutional law. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See generally* Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405, 441–48 (1959). Thus it is essential that section 371 "plainly and unmistakably" proscribe the conduct of defendants before they are punished for its violation. *See United States v. Gradwell*, 243 U.S. 476, 485, 37 S.Ct. 407, 410, 61 L.Ed. 857 (1917); *United States v. Porter*, 591 F.2d 1048, 1055 (5th Cir.1979). Courts may necessarily find it difficult to formulate and apply a definition of "defraud," as that term is used in section 371, that men and women "of common intelligence" will easily understand. *See* Goldstein, *supra*, at 443. "The United States," however, is a term that need not be so broadly and mysteriously defined.

Appellants have defrauded Seminole Electric. Seminole Electric is neither an agency of the federal government nor its representative performing a duly authorized federal governmental function. Rather, under the Rural Electrification Act Congress has deliberately avoided undertaking the construction of rural power plants as a federal government enterprise. I have little doubt that Congress has an interest in "seeing that the entire project [receiving its aid] is administered honestly and efficiently and without corruption and waste." *United States v. Hay*, 527 F.2d 990, 998 (10th Cir.1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976). But in section 371 Congress obviously did not criminalize every conspiracy with the intent or effect of thwarting that objective. Congress has demonstrated well its ability to utilize the criminal law to protect its far-flung financial and other interests in non-

federal programs or entities.[1] Because it has not done so here, section 371 should not be construed to reach appellants' acts.

1. Chapter 47 of Title 18 of the United States Code, concerning fraud and false statements, provides a wide variety of examples. A general provision penalizes the knowing and willful making or use of false, fictitious or otherwise fraudulent statements "in any matter within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1001 (1982). Other federal statutes are more specific. It is a federal crime for any person to make "any false entry in any book, report, or statement of [any Federal Reserve bank, member bank, national bank or Federal Deposit Insurance Corporation (F.D.I.C.) insured bank] with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person." 18 U.S.C. § 1005 (1982). Another section criminalizes the making or passing of statements known to be false "for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department." 18 U.S.C. § 1010 (1982). Federal law prescribes criminal penalties for knowingly making false statements for the purpose of influencing various actions of F.D.I.C. or Federal Savings and Loan Insurance Corporation insured institutions, 18 U.S.C. § 1014 (1982), and for knowingly making false statements "with respect to the character, quality, quantity, or cost of any work performed or to be performed, or materials furnished or to be furnished, in connection with the construction of any highway or related project approved by the Secretary of Transportation." 18 U.S.C. § 1020 (1982).